*(Circuit Court of Cook County. In Chancery.)*,

## Samuel Stevenson

### vs.

## John Alexander Dowie.

(January 31, 1902.)

1. FRAUD—MUST BE CLEARLY SHOWN—SUSPICIOUS CIRCUMSTANCES. A charge of actual fraud must be clearly proven and suspicious circumstances alone are not sufficient.
2. UNDUE INFLUENCE—HOW DETERMINED. The existence of undue influence cannot be determined by the assertion or denial of the parties on the witness stand. It involves the question of the relative condition of the minds of the respective parties at the time of the transaction complained of and upon this subject the evidence takes a wide range.
3. EQUITY—RELIEF AGAINST IMPROVIDENT CONTRACT. Equity will not grant relief against a contract however absurd or improvident it may be if entered into and executed by the party asking the relief, in the free and uncontrolled possession of his mind.
4. EVIDENCE—VALUE OF LETTERS AS. Letters are always valuable aids in arriving at truth; they may be said to be milestones upon the road to truth and are free from all influences that actuate the living witness.
5. UNDUE INFLUENCE—WHEN RELIEF IN EQUITY GRANTED ON ACCOUNT OF. The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality.

It reaches every case, and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed.

6. CONFIDENTIAL RELATIONS—RELIEF IN EQUITY ON ACCOUNT OF— ABUSE OF. Where two persons stand in such relation that confidence is necessarily reposed in one and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, equity will relieve, although the transaction could not have been impeached in the absence of such confidential relations.

7. SAME—BURDEN OF PROOF TO SHOW ABSENCE OF UNDUE INFLUENCE. The "heavy" burden of proof is upon the person occupying the confidential position to show that the influence has not been improperly exerted or the confidence abused.

8. JOINT. ENTERPRISES—LIABILITY OF MEMBERS OF TO CREDITORS AND SUBSCRIBERS—EFFECT OF SECRET AGREEMENT. Where two persons engaged in a joint enterprise enter into an agreement with third persons in relation to the organization of a corporation, the two members of said enterprise are liable to creditors of said corporation and to subscribers for its stock, even though under a secret agreement one of the members of such joint enterprise is relieved from all responsibilities.

9. UNDUE INFLUENCE—EXECUTION OF CONTRACT—RELIEF AGAINST WHERE IMPROVIDENT. Where undue influence in procuring the execution of a contract between parties in confidential relations is charged, the court looks first to see whether the contract is reasonable and beneficial, and whether there was a reasonable consideration for the making of it. While the fact that the contract is unwise, foolish and improvident will not of itself justify a court in relieving the party from the effect of such contract, yet if the court can see that there is want of consideration, or a very inadequate one, such fact should be taken into consideration with other inequitable incidents in determining whether the party was induced to enter into the contract by undue influence.

10. CORPORATIONS—LIABILITY OF MEMBERS OF BY DOING BUSINESS UNDER NAME OF EXISTING CORPORATION. Where persons do business as an incorporated association but under a name similar to that of an existing corporation, which they have procured to be organized and thereafter abandoned, the members are personally liable to creditors who deal with such association under the belief that they are dealing with the corporation.

11. RULE AGAINST PERPETUITIES—PIOUS TRUSTS. Parties will not be allowed to speculate in real estate and manufacturing plants under the guise of "pious trusts" and thus avoid the rule against perpetuities.

12. CONTRACTS—BETWEEN CLERGYMAN AND PARISHIONER—WHEN SET ASIDE—PUBLIC POLICY AND UTILITY. Where a clergyman obtains spiritual ascendency over a person under a state of religious delusion and obtains conveyances or contracts while under such delusion the court will set the same aside on the ground of public policy. The same principles are applicable to such a relation as to that of guardian and ward.

13. CLERGYMAN AND PARISHONER—UNDUE INFLUENCE—KNOWLEDGE OF EFFECT OF INSTRUMENT EXECUTED. Where conveyances are made to a clergyman by one over whom such clergyman has spiritual ascendency the court will not set the same aside if they are purely voluntary well understood acts of the mind, but if they are not of that character the court will inquire into the motive and the intention under which the act was done. The conveyances must not only be voluntary but with knowledge of their effect, nature and consequences and the grantee is bound to communicate such facts to the grantor.

14. SAME—PUBLIC POLICY. Transactions between a clergyman and his parishioner where the influence of the relation prevailed are held to be void upon the principle that the interest of the general public demand such holding.

15. CORPORATION—CARRYING ON BUSINESS UNDER GUISE OF—PUBLIC POLICY. Where a corporation is legally organized for the purpose of carrying on a particular business and officers are elected and the charter recorded, but the business is thereafter carried on under agreement as an unincorporated association so that the public are likely to be misled, such an agreement is against public policy.

16. LACHES—WHETHER TIME SPENT IN EFFORTS TO COMPROMISE WILL EXCUSE DELAY. Equity requires diligence in parties demanding relief from fraud but where time is spent in endeavoring to settle a controversy and thus delay is occasioned, this will take the case out of the rule of laches. The law books with favor upon efforts to settle controversies.

17. RATIFICATION OF CONTRACT—INTENT AND KNOWLEDGE ESSENTIAL. A ratification can only arise from an act of the mind, and the intent of the party to ratify, knowing all the facts and circumstances connected with the transaction.

18. RATIFICATION OF VOID AGREEMENT. Where an agreement is void as against public policy it is doubtful whether the same can be ratified.

19. CONTRACTS—RELIEF WITH RESPECT TO—WHERE PARTY SOUGHT INDEPENDENT ADVICE. The fact that a party sought independent advice before entering into an agreement is not a bar to obtaining relief with respect to the agreement. It is but a circumstance to be taken into consideration.

20. Undue Influence—Person Under Cannot Repudiate Trans-action as to Third Person. A person cannot on his own right repudiate a transaction as to a third person by reason of undue influence exercised as to him.

21. Executors—Rights of, to Relief in Individual Capacity Where Rights Appertain to Representative Character. A party cannot have relief as an individual complainant where his rights are those which appertain to him in his representative character as executor.

22. Corporations—Stock Held by One Person Whether Neces-sary Party. The fact that all of the stock of a corporation is held by one person does not excuse the joining of such corporation as a party defendant.

23. Corporations—Representation by Officers and Stockholders in Legal Proceedings. A corporation is not represented in legal proceedings by its officers and stockholders.

24. Parties—Having Interest in Subject Matter—Duty of Court. It is the duty of a court of equity to require that all persons not parties to the suit who appear to have any interest in the subject matter in litigation, be brought into court before final decree.

25. Equity—Mispleading in, and Want of Form. It is a maxim in equity that no person shall be injured in its court by mispleading or want of form.

Bill to cancel certain contracts, dissolve partnership and for the appointment of a receiver. Gen. No. 222,960. Heard before Judge Murray F. Tuley. The facts are stated in the opinion.

*E. L. Reeves,* for complainant.

*Samuel W. Packard,* for defendant.

Tuley, J. :—

The complainant in this case, Samuel Stevenson, in the year 1899, and for about twenty years previous thereto, had been engaged in the manufacture of lace goods at Beeston, Nottingham, England. He had considerable reputation as an expert manufacturer, and was engaged in a profitable business. Although he was one of the leading manufacturers of lace, his education was a limited one, being derived, as he stated, in early life at the knee of his mother by reading the family bible. He was reputed a zealous

Christian, held gospel meetings in his own house, which were attended by his numerous employees and others. He aspired to be a missionary preacher and was in the habit of delivering sermons to congregations. His credit appears to have been good in his business relations, and he was noted for his kind treatment in dealing with his employees.

In 1894 he received a copy of "Leaves of Healing." He wrote the defendant Dowie to No. 6020 Edgerton avenue, Chicago, enclosing a contribution of two pounds, asking for additional copies of the "Leaves of Healing," Dowie's photograph and twelve copies of the "Leaves of Healing" for each week to the end of the year. To this letter Dowie replied the next day after receiving the same. The correspondence continued between them, and in 1899 Dowie wrote to the complainant a letter of date December 20th, 1899, in which, after considerable talk about the Christian Catholic Church, of which Dowie was General Overseer, he says: "Now, this brings me to the place where I feel as your General Overseer that it is my duty to address to you a call for service. It is this—come as soon as ever you can to America, and be my guest in Zion Home, and see the site of Zion City, and investigate for yourself the condition of your special manufacture and the prospects of success for it in America."

It appears that prior to December, 1899, Stevenson made application by letter to Dowie, and had been received as a member of the Christian Catholic Church. In January, 1900, the complainant Stevenson came, bringing with him his only child, aged fourteen, to America, was received and treated with marked distinction by the officers of the church, and was invited to, and became, for a considerable part of the time during which he was in America, a guest at the defendant's home. He was treated with great kindness and consideration by the defendant and his family, was prominently put forward in the church meetings by Dowie with great praise and commendation, in connection with Dowie's declared intention to establish the coming City of Zion, and to build therein a large lace manufactory. Stevenson, at Dowie's suggestion, visited the Eastern United States, for the pur-

pose of acquainting himself with the condition of the lace industry of the country and the prospects of success of the proposed establishment at Zion City. He was made a deacon in the church when upon this visit.

The question of the purchase by Dowie of all, or nearly all, of the plant of Stevenson, in Beeston, England, and its removal to this country, and setting the same up in Zion under the management of the complainant Stevenson, arose, and, ultimately, the price was agreed upon. The price fixed was $50,000 in money and a further consideration of $100,-000 full paid stock to be given to Stevenson in a corporation to be formed by Dowie under the laws of the state of Illinois, with a capital of one million dollars. A written agreement was entered into between Dowie and Stevenson the 12th day of April, 1900, which provided that $50,000 was to be paid Stevenson as follows, to wit: $35,000 cash, and the balance of $15,000 in payments of $5,000 each, in the following June, July and August. In addition to selling the lace factory to Dowie, Stevenson covenanted and agreed to proceed to England and take the necessary steps for the transplanting of the factory to the site of Zion City. Stevenson also covenanted that any charge or liens that might exist against the plant, he would discharge, but any part of the plant which it was deemed impractical to remove, might be sold by Stevenson, and the money to belong to him, Stevenson. The removal was to be at the cost of Dowie. Dowie agreed also to incorporate, or cause to be incorporated, a stock company, to be called the "Zion City Lace Industries," with stock of one million dollars, divided into shares of $100 each, and to transfer, or cause to be transferred, a tract of land in Zion City suitable for the location of said industry, containing not less than twenty-five acres of land, and all of the machinery and patents purchased by him from Stevenson, and the consideration of such conveyance by Dowie to the corporation was to be treated as payment in full of $620,000 capital stock of the corporation, out of which he was to give Stevenson $100,000, paid up stock, and the balance of the stock, $380,000, was to be treated as treasury

stock, to be used for the purchase of machinery, tools, and building appliances, Dowie guaranteeing to purchase, or cause to be purchased, at par so much thereof as might be necessary for that purpose. Of Dowie's $520,000 of stock remaining, he was to have issued to himself stock amounting to $501,000, and $19,000 of the stock was to be issued and transferred to certain parties, most of whom *were employees* or lace experts who Stevenson was to induce to come to America, to work in these new industries.

Leaving his son at Dowie's home, upon the next day after entering into this agreement, Stevenson returned to England for the purpose of dismantling his factory, disposing of his property and arranging to ship the machines, etc., to America, and bring out with him the expert lace makers to be employed in the industry. He did have the machinery boxed, crated, and shipped to America, made arrangements with various employees to come to America to work in the factory, and placed orders for new machinery for the enterprise with various manufacturers of machinery in England and Scotland.

Although Dowie did furnish Stevenson after his return to England about $20,000, some trouble and inconvenience apparently was caused by the failure of Dowie to promptly respond to the demands of Stevenson in regard to moneys to be paid on account of his expenses and on new machinery ordered. Stevenson took with him the $35,000 cash paid him by Dowie, and upon his return to England, discharged an indebtedness which was held in the nature of a lien upon his plant by one Woodward, to the amount of $30,000.

During the three or three and a half months that Stevenson had been in America, a large part of the time in the private family of defendant Dowie, he fell in love with, and became engaged to be married to, "Methie" Dowie, called by Dowie "his sister," but who was, in fact, his wife's sister and Dowie's own cousin. The marriage was to take place upon the return of Stevenson after his visit to England. Stevenson returned from England to America and arrived in Chicago about the 10th of July, 1900, and went immediately to

the home of the defendant. On the 24th day of July Stevenson was married to Methie Dowie, by the defendant in the Zion Tabernacle, before a large audience. The complainant Stevenson, on the day of his marriage, executed a note of $50,000, payable to Dowie as trustee for Methie, Stevenson's future wife, on demand, reciting that Dowie was to hold as security for the payment of the note all of Stevenson's interest in the Zion Lace Industries.

While Stevenson was in England, Dowie, in pursuance of the agreement of the 12th of April, did cause an incorporation to be formed for the purpose of manufacturing lace, linen, spinning cotton, and weaving wool, and making such special machinery as was necessary in the carrying on of such industries, a corporation to be known as the "Zion Lace Industries." The stock was all subscribed for, Dowie subscribing for all but four $100 shares. The remaining four shares were subscribed for by members of Dowie's business cabinet. No transfer was ever made to the corporation of the property purchased by Dowie from Stevenson, nor was ever any stock issued by the corporation, although the same had been prepared ready for issue. About the date of said marriage, or very soon thereafter, Dowie proposed to Stevenson, that the corporation project be abandoned and that a new agreement be made for the carrying on of the Zion Lace Industries upon a similar plan to that which had been adopted for carrying on the Bank of Zion, and other projects connected with the building of the coming City of Zion where the industries were to be located. This resulted in a new agreement being dated August 4th, 1900. This agreement referred to in the evidence as the "public agreement" is executed on the 8th of August, 1900; there being, it is contended by defendant, a private agreement between the complainant and defendant, executed at the same time and part of the same transaction.

The public agreement is unusual in its character, extraordinary in its provisions, and probably unlike any agreement between parties ever produced in a court of record. It was entitled "Articles of Agreement, Zion Lace Indus-

tries." It purports to be an agreement between John Alexander Dowie and Samuel Stevenson on the one part, and the preferred shareholders or persons who might become preferred shareholders thereafter, on the other part. It recites, in substance, Dowie's "purchase of a large tract of land in Lake county, a few miles north of Waukegan, in the state of Illinois, upon which he intends to build a city to be known as Zion City, and for the purpose of furnishing employment to some of the residents of said proposed city, he has purchased the lace factory of Samuel Stevenson, located in Beeston, Nottingham County, England, or the greater portion of tangible property thereof," describing the same, "which is to be removed by said John Alexander Dowie to said Zion City site, where said factory and other adjuncts and accessories thereof are to be located upon, and have appropriated to their use, not less than twenty-five acres, constituting part of said Zion City site; and

"WHEREAS, it has been agreed between said John Alex Dowie and said Samuel Stevenson that the said factory * * * and the said twenty-five acres upon which the same is to be located as before mentioned, together with the personal influence and services of said Dowie in establishing and carrying forward the business contemplated by this agreement, which is to be done under the name of 'Zion Lace Industries,' is to be considered and estimated as of the value of $670,000 and is to be represented by five thousand shares of stock of the par value of $100 each, which are to be known as proprietary shares, and seventeen hundred shares of the par value of $100 each, to be known as common shares, which are to participate in the distribution of the profits derived from said business in the manner hereinafter specified; and

"WHEREAS, the said * * * Dowie is desirous of obtaining more capital to enable him to purchase more machinery and other personal property for said industries, and for the erection of the buildings therefor, and for other necessary expenses connected with the establishment, enlargement, and carrying forward of said industries, which industries are to include the manufacture of lace and linen, the

spinning of cotton, the weaving of wool, and other adjuncts and accessories of such industries.

"Now, THEREFORE, The undersigned hereby subscribe for and agree to pay to said John Alex Dowie the sums set opposite their respective names, for the purpose of furnishing such further capital for said Zion Lace Industries, upon the following terms and conditions:

"1. The fund subscribed for shall be divided into shares of $100 each, and shall be known as the preferred capital stock of said Zion Lace Industries.

"2. All shares of stock in said Zion Lace Industries shall be represented by certificates, which shall be issued to each shareholder, stating the number and kind of shares held by him, and shall be signed by said John Alex Dowie, or by his attorney in fact, and by the secretary."

Provides for the assignment of shares and the issuing of a new certificate upon such assignment, the assignee becoming a shareholder, and succeeding to all the rights and privileges of the assignor of the certificate.

The interest of the shareholders and subscribers is declared to be personal property, and on the death of any shareholder, to go to his personal representatives.

Provides: "*It is distinctly understood and agreed, that the shareholder herein shall not become copartners together with said John Alex Dowie or said Samuel Stevenson in the business of said Zion Lace Industries,* but that the capital contributed by common and preferred shareholders shall be returned to them in any event as herein provided; and that the profits which common and preferred shareholders shall receive in the way of dividends shall be by way of compensation for the use of their capital, and all the assets and property of the Zion Lace Industries, including the capital contributed by the common and preferred shareholders, shall be held, owned, possessed, and controlled by said John Alex Dowie, and in case of his death, by his executor and trustee or successor. No other shareholder shall have any title to, or interest in, legal or equitable, or possession or control of, any assets or property, real or personal, of said Zion Lace

Industries, nor any right, authority or power to make any sale, transfer or disposition thereof, or to contract any debts or incur any liabilities, or act in any way for said Zion Lace Industries, but the said John Alex Dowie shall alone be responsible for all the debts of said Zion Lace Industries, and all actions and suits by and against said Zion Lace Industries shall be carried on in his name," and gives him full authority "to manage, lease, sell, exchange, mortgage, and convey, from time to time, the real or personal property of said Zion Lace Industries, or any part thereof, as he shall deem best;" the purchaser or mortgagee is not required to see to the application of the money so raised.

Gives Dowie authority to make such rules for the management of the affairs of said Zion Lace Industries as he shall deem best "not inconsistent with the provisions of this agreement."

"The secretary, general manager and all the employees shall be employed, and their salaries fixed by Dowie, and they shall be responsible to and removable by him alone. Said Samuel Stevenson shall be the first general manager of said Zion Lace Industries, under the supervision of said John Alex Dowie. Dowie to receive no salary or compensation for his services. In some conspicuous place in the office of the Zion Lace Industries there is to be posted a notice, in substance, as follows: 'The Zion Lace Industries are not incorporated. John Alex Dowie is the owner of all the property and assets of the Zion Lace Industries, and responsible for all obligations. Shareholders have no power to act for or bind the Zion Lace Industries, in any way, and are not liable for any debts.' Dowie guarantees to pay interest on all shares of stock, common and preferred, at the rate of six per cent. per annum, payable semi-annually, the first dividend being payable January 1st, 1901. Stock to commence to earn dividends from date of issue.

"On the 1st day of July, 1902, and on the 1st day of every July thereafter, there shall be paid on each common and preferred share of stock, then outstanding, 'a further dividend, if earned, out of the net profits of said Zion Lace Indus-

tries,' at the following rates: 'From July 1, 1901, to July 1, 1902, at the rate of seven per cent., adding one per cent. for each year until the year from July 1, 1906, to July 1, 1907, reaching the rate of twelve per cent., and thereafter at the rate of twelve per cent. until the termination of the agreement.' 'But it is distinctly understood and agreed that all dividends above the six per cent., guaranteed as aforesaid, must be derived from the net earnings of the said Zion Lace Industries, as herein provided, or else they are not payable.' If default should be made in the payment of the extra dividend, over and above the six per cent., the secretary shall, soon after the 1st of July, wherein the default occurs, prepare and mail to each shareholder a statement of the condition of the Zion Lace Industries, so that the shareholders may have some idea how long they may have to wait until the defaulted dividend is earned and made up to them; but 'the shareholders shall have no right, without express permission is first obtained from said John Alex Dowie to examine the books of said Zion Lace Industries.'

"5. When the net profits are ascertained, on or about the first day of July of each year, the same shall be used to pay the full amount (or pro rata as far as the same will go) of all the dividends due and unpaid upon all the preferred stock; and after the payment of such dividends then the balance of the profits to be used to pay dividends due and unpaid upon the common stock pro rata. After the payment of all dividends due upon said common and preferred stock at the highest rates herein stipulated for the balance of the net earnings to be applied to the payment of dividends upon the proprietary shares of stock in the Zion Lace Industries owned by John Alex Dowie."

Also contains a provision by which if he receives any such dividends and the future net profits should be insufficient to pay the agreed dividends payable out of the profits, that Dowie will refund such dividends as he receives, to the amount necessary to pay the same.

Also provides that common and preferred shareholders shall have no right to an interest in the profits of said Zion Lace

Industries, or its property or assets, beyond the right to receive the maximum amount of dividends provided for, but all the profits "over and above such dividends, as well as all its property and assets, shall belong to and be the property of said John Alex Dowie, without any liability to account therefor to any party whatsoever. John Alex Dowie is given power, so long as he shall be of the opinion that the capital can be advantageously used, to sell shares of stock, but no shares of preferred stock to be sold for anything but cash and at its par value. Shares of common stock may be issued by said Dowie for property purchased for said industries. Also, that it is expected that the Zion Lace Industries will grow to such proportions as to make it necessary 'in order to enable it to expand so as to successfully handle its increase of business, * * * to have a very much larger quantity of land constituting a part of said Zion City site, and amounting to probably 350 acres altogether, and it is therefore agreed that said John Alex Dowie may from time to time, as he may deem best, appropriate more land to the use of said Zion Lace Industries, and have proprietary shares of stock issued to himself therefor upon such estimate of the value of said land as to him shall seem wise and best.' The shares of stock so issued to stand upon the same basis as the other proprietary shares."

Provides that Dowie shall keep a share register and stock certificate books and all other proper books to record the business of said Zion Lace Industries.

Provides for the method of giving notice to shareholders and that the stock certificate and share register shall be considered sufficient evidence as to the ownership of the shares at any time.

That neither the death of said Dowie nor of Stevenson nor of any shareholder, "or any change in the ownership of the shares or certificates, in said Zion Lace Industries, shall work a termination or dissolution of this joint enterprise;" that neither any assignee of any shareholder or his personal representatives, in case of death, shall be entitled to an account or an inventory, but he may have a new certificate

issued to him upon the surrender of the old one. But if he does not care to have a new certificate and become a stockholder, he may, upon request to the secretary, surrender the certificate owned by the decedent and obtain the promissory note of said Dowie, or his executor, etc., ''for the amount of the par value of the shares represented by such certificate payable to the order of the representative of such decedent, and due on or before eighteen months after the date of the death of such decedent, with interest thereon at the highest rate which the holder of such shares would be entitled to dividends thereon for the period covered by said note.''

In case of the death of Dowie he is to name an executor and trustee in his will, who ''shall succeed to all the assets, property, and liabilities, duties and responsibilities, rights, powers, and privileges of said Zion Lace Industries, and of said John Alex Dowie, under this agreement, so that this joint enterprise may continue until July 1, 1919, unless sooner terminated by the redemption of all the outstanding shares as herein provided.''

Then provides for the manner of redeeming the shares upon notice given by Dowie at any time; that such redemption will be made at the office of the Zion Lace Industries, at a certain time not less than one year, such notice to convert the shares into a final money demand, due at the time specified in the notice for redemption for the full amount of the par value of the shares, with interest at a rate, which, added to the dividends, would be within the highest rate of dividends provided for in the agreement, and when such notice is given, the shareholder on the surrender of the certificate shall receive a merchantable promissory note signed by Dowie, or his executor, etc., which would become due on the date fixed for redemption. After the giving of such notice the shareholders have no further interest in the earnings or profits of the industry, and shall not be entitled to any statement of the affairs or conditions thereof; but his rights shall be simply those of a creditor of said Dowie, his executors, etc., for the amount which will become due to him upon his

shares of stock at the time appointed for the redemption thereof.

This "joint enterprise" it is provided "shall continue until July 1, 1919, unless sooner terminated by the paying off of all shareholders." And at that date Dowie is to pay the full par value for every share of stock outstanding "which sum, together with the dividends previously paid, and the dividends due on that date upon such shares, shall be in full payment and satisfaction of all claims, rights, interests, and demands against said Zion Lace Industries, or said John Alex Dowie."

"In order to manifest the assent of said John Alex Dowie and said Samuel Stevenson to all of the terms and provisions of this agreement, made with the preferred shareholders of the said Zion Lace Industries, the said John Alex Dowie and the said Samuel Stevenson have hereunto subscribed their names," signed by Dowie and Stevenson, and below their signatures appears:

SUBSCRIBERS' NAMES, ADDRESSES AND AMOUNTS SUBSCRIBED BY THEM.

| Subscribers' Names. | Addressses. | No. Shares. | Total Amount Subscribed in Dollars. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

At the time of the signing of said public agreement there appears to have been signed at the same time and as a part of the same transaction, a so-called "private agreement." This private agreement bears the same date and is, in substance, as follows: "THAT WHEREAS, By an agreement dated the 12th day of April, A. D. 1900, providing for Dowie's organizing an incorporated stock company for one million dollars, to acquire and carry forward a manufacturing enterprise to be called the Zion Lace Industries, the stock of

which should be divided into shares of $100 each and of which John Alexander Dowie should have $520,000 and said Samuel Stevenson $100,000, full paid stock; and

"WHEREAS, it is now deemed advisable that said arrangement should be changed, and that the business which said contemplated corporation was to acquire and carry on shall be owned, controlled, and carried forward by the said John Alex Dowie in his own right;

"Now, THEREFORE, it is hereby mutually agreed by and between said John Alex Dowie and said Samuel Stevenson," that instead of giving Stevenson the $100,000 of the full paid stock of the said corporation, Dowie was to give him 1,000 shares equal to $100,000 of stock known as common stock in said Zion Lace Industries, to be issued to him in accordance and under the provisions of the agreement dated August 4th, 1900, a copy of which last mentioned agreement "is hereto attached and made a part hereof."

Provides that Dowie shall be relieved from his agreement to turn over to the contemplated corporation the property and assets bought by him under the agreement of April 12, 1900, and that he should "own, hold, possess, and enjoy, individually and in his own right, free from any trust, all of said assets and property, as well as the rights and privileges which said corporation would have owned, possessed, and enjoyed" under the agreement of April, 1900, if it had been fully carried out, "and in lieu of so turning over to said contemplated corporation the said property, assets, land, rights, and privileges aforesaid, John Alex Dowie is to contribute toward the capital stock of said business to be carried on under the name of the Zion Lace Industries, in pursuance of the public agreement, a copy of which is attached hereto, all the said property, assets, rights, and privileges which he was to give or transfer to said contemplated corporation, and is to receive and have issued to himself and such parties as he may designate therefor, a certificate or certificates for five thousand shares of stock of the par value of $100 each in the said Zion Lace Industries, which are to be known as proprietary shares, and also two hundred shares

of the par value of $100 each of the common shares of stock in said Zion Lace Industries, to be issued in accordance with and under the provisions of the agreement made with the preferred shareholders in said Zion Lace Industries.''

Then provides that Stevenson sells to Dowie for the said Zion Lace Industries, in addition to what he sold by the agreement of April 12th, 1900, other machinery and property, and that for the additional machinery and property Stevenson is to be paid in cash by Dowie the sum of $35,000, and the money or cash so paid to Stevenson, together with a sum sufficient to make a total amount of $50,000, is to be turned over by said Stevenson to said John Alexander Dowie, ''as trustee for Mary Ann Stevenson, nee Dowie, the wife of said Samuel Stevenson, in payment for the promissory note of said Samuel Stevenson, to said John Alex Dowie, trustee, given under the ante-nuptial marriage settlement, and that the said $50,000 so received by said John Alex Dowie as trustee, is to be held, owned, possessed, and enjoyed by him as an individual in his own right, and that he is to issue therefor to said Mary Ann Stevenson, a certificate or certificates of stock for five hundred shares of the par value of $100 each of the common stock in said Zion Lace Industries, under and in pursuance of the agreement with the preferred shareholders, a copy of which is hereto attached.'' Signed under the same date, the 4th of August, 1900, by John Alex Dowie and Samuel Stevenson. Below their names is: ''I, Mary Ann Stevenson, hereby assent to and approve of the foregoing agreement.

''Witness my hand and seal the day and year last above mentioned.

''Mary Ann Stevenson. (Seal.)

The ante-nuptial marriage settlement, referred to in the last mentioned or so-called private agreement, was contained in a note given by Samuel Stevenson to John Alexander Dowie, as trustee for Methie Stevenson for $50,000, payable on demand, and pledging as collateral security for the payment thereof, all of his (Stevenson's) interest in the Zion

Lace Industries. This note is dated the 24th of July, the day on which Stevenson married Methie Dowie.

The weight of the evidence tends to show that there were three copies made of the so-called "public agreement" and that two of the three copies had a copy of the "private agreement" attached to the same; that one copy, with the private agreement attached, was delivered on the evening in question, the 8th of August, to Samuel Stevenson, a like copy to John Alexander Dowie, and the third copy, which was intended for the subscription of those who should afterwards become preferred shareholders, was retained by Attorney Packard, who was present at the time;

That the price of the additional machinery, put at $35,000 in the agreement, was raised from $30,000 to $35,000 upon the suggestion of Mr. Dowie or his attorney, thereby making the amount due to Samuel Stevenson upon the two separate sales of parts of his plant, the sum of $50,000—$15,000 on the first sale, which had not been paid, and $35,000 on the second sale.

It also appears that John Alexander Dowie drew checks for said two amounts upon the Zion Bank, payable to the order of Stevenson, and that thereupon Stevenson drew his own checks upon the Zion Bank, for $50,000, and gave the same to Dowie, in payment of his $50,000 ante-nuptial note; that his wife, Methie Stevenson, directed Dowie to invest the same in common stock of the Zion City Lace Industries as organized under the public agreement of August 4th.

Dowie, his wife and family and Stevenson and his wife had arranged to leave for Europe upon the next day. Barnard, the financial manager, was present upon the evening that the papers were signed.

Dowie gave to Barnard certain papers, including his power of attorney, and the combination of his (Dowie's) private safe, and laying his hands upon Barnard's shoulders, prayed the Lord that He might keep him faithful to his trust.

At the same time the evidence tends to show that certain papers were delivered by Stevenson to Barnard, or to Dowie, who then and there passed the same over to Barnard, al-

though Stevenson swears that he gave to Dowie his copy of the August 4th contracts to keep for him, and that he gave Barnard only a power of attorney to act for him, and a will of his own and one of his wife, the next morning at the Zion Bank, Chicago.

Stevenson's subsequent conduct in reference to the custody of the papers in question, tends to show that he believed that he gave Dowie the August 4th contracts and also the April 12th agreement on the night in question, and the other papers to Barnard the next day.

Soon after they left the so-called public agreement was published in the Leaves of Healing. The private agreement was not published or made public in any way, until after the trouble arose between Dowie and Stevenson, which resulted in the bringing of this suit.

Stevenson and his wife, the defendant and his wife and family went first to the Paris Exposition, where, after remaining for a few days, they went to England, made the trip to Scotland and to Ireland and finally returned to England, the complainant being busily engaged in looking after the shipping of the machinery of his plant, and the employing and sending over of some of the lace makers employed in the lace industries of Zion City. In the trips through England, Scotland and Ireland, Stevenson assisted Dowie in the holding of his meetings, which the evidence tends to show were not attended with a great deal of success, several of them being very turbulent.

November 6th, 1900, Stevenson sailed with his wife and Deaconess Breger and her mother for America. The wife of complainant was sick at the time they sailed, and died on board ship when two or three days out, and was buried at sea.

The complainant arrived at Chicago about November 28th, most of the machinery arriving during the months of October and November of the same year. The defendant remained a short time in England, and on the continent, returning to America in the month of January, 1901.

Difficulties arose between the complainant and the defend-

ant in regard to meeting obligations connected with the ordering of new machinery by the complainant for the Zion Lace Industries, and also in regard to the management of the work that was going on in the establishment of the plant. These difficulties culminated in an open breach about the 9th or 10th of April, 1901, and complainant's brother, Arthur Stevenson, was placed in complainant's position as acting manager or assistant manager of the industries. Certain negotiations which will be hereafter referred to, were had; and efforts made from time to time to settle the difficulties between Stevenson and Dowie, which continued until the month of November. They were ineffectual, and the result was the filing of the bill in question.

The original bill in this case is loosely and by no means carefully drawn. The complainant aims to set out the facts relied upon by him, and seeks the relief by setting aside all the contracts referred to, upon the ground of undue influence, and in addition thereto, to avoid the contracts called the public and the private agreements, dated August 4th, 1900, upon the ground that those two agreements were part of one and the same transaction, and, if the complainant signed the private agreement upon the evening of August 8th, he did it, not knowing that he was signing the so-called private agreement; and alleges that the private agreement was not read to him, or referred to, and that he did not know of its claimed existence until about the forepart of the month of June thereafter, when he, for the first time, saw a copy of it in the hands of the attorney for the defendant; that the defendant having signed the papers, they were passed over to him and that he signed all of them without reading, supposing that they were duplicate copies of the public agreement only.

There were some peculiar, if not suspicious, circumstances connected with the custody of Stevenson's copy of the contracts made between him and Dowie, which were delivered by Stevenson to Dowie or to Barnard, and placed in Dowie's private safe the night of August 8, 1900, to which Deacon Barnard was given the combination. Barnard swears he re-

moved Stevenson's papers from the private safe the next day and put them in the safe at Zion City Bank. They all turned up long after the breach between Dowie and Stevenson in Dowie's possession. One copy of the public agreement had detached from it the private agreement of August 4th, probably for the purpose of printing the public agreement. A certificate for $50,000 of common stock running to Methie Stevenson, which Barnard swears he issued after Stevenson left for England and placed among Stevenson's papers left with him (Barnard) and which he swears he gave to Stevenson with Stevenson's other papers on the latter's return from England in the next November or December, was also found to be in Dowie's possession after the commencement of this suit.

The manner in which these public agreements were found to be in Dowie's possession is explained by Dowie in the evidence adduced on his part, and may in part be accounted for upon the theory that Barnard left the same in Dowie's safe at the time he says he transferred Stevenson's papers to the Zion Bank safe.

On account of the unreliability of complainant's evidence as to what took place upon this night of August 8th, 1900, when the papers in question were signed, it would be contrary to the weight of the evidence to hold that Dowie obtained the possession of said papers by any trickery on his part, or by the fraud of any one connected with him; and for the same reason the court would not be justified in concluding that complainant's signature to the so-called private agreement was obtained by any deceit or trickery practiced upon him at that time, as alleged in his bill of complaint.

A charge of actual fraud must be clearly proven and suspicious circumstances alone are not sufficient, but are of little importance if a fairly reasonable explanation of them can be given.

The court should say here and does say, that from many years' acquaintance with Mr. Packard, the defendant's solicitor, that the court knows him to be incapable of practicing any trickery or any intentional deceit in any transaction.

If the complainant is entitled to any relief by reason of what took place upon the night in question, it must be upon some other ground than the specific ground alleged in his bill, that his signature was obtained to the private agreement by any trick or actual fraud connected with the obtaining of such signature.

Let us now consider the real question in this case, whether there was any "undue influence" exercised by defendant Dowie over complainant in the transactions complained of, and if so, to what extent, and the relief, if any, that complainant is entitled to.

Where the relief claimed does not arise by reason of physical force or trickery or other actual fraud, but from what is known as constructive fraud (of which character is that known as "undue influence") the evidence necessarily takes a wide range.

The existence of "undue influence" cannot be determined by the assertion or denial of the parties upon the witness stand. It involves the question of the *relative condition of the minds of the respective parties*, at the time of the transaction complained of; this can only be ascertained by a searching investigation into the social, business and spiritual relations of the parties during the entire time of their acquaintance and a careful consideration and analysis of the evidence bearing upon such relations.

It is not the province of a court of equity to grant relief against any contract, however absurd or improvident it may be, if it was entered into and executed by the party asking the relief, in the free and uncontrolled possession of his mind; that is, if they are pure, voluntary, well understood acts of the mind of the party executing the same—unless such contract be void upon the ground of being opposed to public policy,—the public good, in other words.

The providence or improvidence of a contract is an ingredient to be taken into consideration, but does not, standing alone, justify the interposition of a court of equity to relieve a party from the consequences of his own folly.

In passing on the question of the alleged undue influence

of John Alexander Dowie over the complainant Stevenson in the transaction in question, it is necessary to review in detail the relations that actually existed between the parties commencing with their correspondence which began in 1894.

The testimony showing the relation between the parties consists largely in written evidence; letters which passed between the parties at a time when no litigation was contemplated. Letters are always valuable aids in arriving at the truth; in fact, they may be said to be milestones upon the road to truth. They do not forget or "disremember"; they have no memory; they cannot color their evidence; they speak the honest truth as of the date they are written, and are free from all influences that actuate the living witness.

The complainant Stevenson, carrying on his business at Beeston, had sent to him the first issue of the paper published by John Alexander Dowie, entitled "Leaves of Healing," with which he appears to have been much pleased, and in his letter written a few days after receiving the paper, he stated that he read it to his people (meaning those of his employees and others who were accustomed to assemble in his house and hear sermons from him) "last night, amidst shouts of hallelujah and amen, together with tears of joy."

This letter, being the first letter written, was received by the defendant December 11, 1894. After stating as to their own meetings, the number per week, etc., the complainant says "I am engaged in business as a lace manufacturer. * * * Our people are really a people of prayer. Some meetings we never rise from our knees. The dear Lord is blessing souls in saving, but we cannot seem to make any headway in healing. Sometimes I have laid my hands on people and they have been wonderfully healed, and then it has been quite a long time before another has been successful." And he does not know the reason why. Refers particularly to a dear girl, Lizzie Daubney (of whom more hereafter) suffering from curved spine, who has been benefited but not healed; "we really do want God to work with the signs following." "If God would permit, I would so like to take a trip to see you and bring Mr. Moody and some of

my workers. * * * Do you pray for souls and claim their healing if they do not ask? Or do you leave it until they do ask? * * * I am very perplexed about some cases, and I often wonder if I am touching holy things with unholy hands; or, in other words, doing priestly work without priestly authority.'' Winds up by asking Dowie to send him twenty-four copies of the Leaves of Healing, first issue, and enclosing two pounds, post office draft.

To this letter John Alexander Dowie, upon the next day addressed a letter to complainant, commencing, ''Dear Brother in Christ.'' This letter is very long, about twenty-five hundred words, and with other letters of the defendant, as also do the letters of Stevenson, pretty clearly indicate the mental characteristics and peculiarities of the two men.

In this letter the defendant acknowledges the receipt of the two pounds sent him by Stevenson, and refers to the late Dr. Boardman, who had published some work upon divine healing, and says that Dr. Boardman made a great mistake in associating himself with a medical practitioner in writing his book, ''I am the Lord that Healeth Thee,'' and in claiming that sanctification must precede healing; that this book has done great injury to the cause of divine healing by reason of the erroneous position assumed. ''We have long taken the most extreme position in this matter, believing that truth is always extreme, and have taught with re-. gard to these three points: (1) That God never intended vegetable and mineral poisons to be used as healing agencies, and that doctors and surgeons, with their drugs and their knives were entirely needless for a child of God. * * * That sanctification does not precede healing. * * * That no one has a right to witness to salvation who is not saved from sin, and no one has a right to witness to healing who is not saved from sickness.'' Also says, that he is a realist, not an idealist. He is pleased to see that Stevenson, ''realizes that the talent for business is a talent for God,'' and that God first called him (Dowie) to His ministry, taking him from the counting house, and from active and successful business life.

Says that he is "praying with on an average more than a thousand persons a week; that during the week he has seen more than eight hundred seek salvation, and has laid hands upon nearly five hundred, although he has not yet reached the middle of the week; says his time does not permit him to dictate many letters as long as this, but, "I have been impressed that your letter is not an accidental but a providential, communication. * * * You have said you would like to talk with me and I very heartily invite you to come over and talk. * * * *I have under God committed myself to the formation and establishment of institutions of a permanent character in America* in connection with my ministry in the Lord." This letter is written from 6020 Edgerton avenue, Chicago.

It is evident from these two letters that they were striving along the same lines as regards the so-called divine healing, or healing by the aid of prayer.

It appears that Stevenson responded to Dowie by a letter of the first of January, which is not in evidence; that Dowie responded to that by a letter dated January 16, 1895, acknowledging the receipt of Stevenson's letter and twenty pounds. "I notice that you ask me if I could help you in some of your difficulties, and I very willingly shall endeavor to do so." Then he says, "It is manifest that *your difficulty here is that which besets the churches generally, the want of consciousness of authority; the failure to be able to command in the name of the Lord, and to expect obedience* upon the part of those who are convicted."

"My best answer to you upon this point will be to give you my own experience. When I preach the Word, *I preach it with authority.* * * * The whole object of my discourse is, first, to create conviction of sin, and then, to demand confession and forsaking of sin and immediate surrender to God. Hence I do not adopt the course of persuasion merely, although I do endeavor to persuade men of the righteousness of God and of their own relation to Him by all the arguments that He enables to use; but when the discourse is finished and we bow our heads in prayer, I close my

petition to God for all the unconverted, with a call to repentance, *which I deliver in an authoritative manner,* and with the conviction that I have a right to do so. I tell them that *God now commands them to repent,* and therefore in His name I demand that they shall do so then and there by rising, and in answer to my questions, declaring their hatred of sin and their determination to forsake sin; to make restitution to those whom they have wronged, and confess. Having done this, and received their word that 'by the grace of God they will,' I lead them in prayer and ask all who desire to be right with God to follow me in that prayer. You will see a specimen of such a prayer in Leaves of Healing of a recent date.

"The results which follow this course are very great. In some meetings I have seen as many as two thousand persons rise and thus openly confess and forsake sin; and it is, I presume, a fact that there is an average of about a thousand such open confessions made every week," and adds, "Of course, those who take that position *must have the divinely given authority,* and it is vain for one to assume it to whom God has not given it." Says that, should he come to this country, it would be well for him to arrange matters so that he could stay several weeks, "in one of our homes, * * * at the same time I recognize that it is not wise to take such a journey unless you are clearly guided by God," etc.

Desires him to tell all his people "how fully I reciprocate that tie of love which binds all who are one in Christ together with a bond far stronger than the tie of blood. The blood of Christ is a stronger bond than the blood of family relationship." Writes of a project that he has had in mind to take with him in an encampment at Jerusalem on the first of January, 1900, at least five hundred persons, and to have an international praise and testimony meeting, and conduct a mission for some time.

Refers to passages of the bible predicting such a meeting, and says he is not given to dreaming of dreams of a fanciful kind, but "I am I hope *practical* in all my undertakings."

The evidence in this case fully sustains his allegation as to his being a practical person.

Concludes by declaring that he shall not renounce his citizenship and become an American citizen, and that he has no less than five secretaries and still cannot keep up with his work.

On February 1st, 1895, Stevenson replied to Dowie's letter of January 16, 1895, and says: "Your letter has helped me very much. I have seen more than once the truth of what you say that 'it is in vain for one to assume divine authority,' for anything, except it is given by God. * * * Am I so divinely authorized? I think not, although I do bless God for the little work He permits me to do, yet it fails to produce manifest results, such as is the case with you, and what my heart longs and craves for." He says he is praying for it, intensely, daily and hourly. Asks him to name a date when he can join them in prayer. "I have felt for some time God was going to do something with me, but have said very little about it to any one. * * * One thing certain, God has me in His hands, and I am, so far as I know, willing for Him to use me as He pleases. I feel confident God will bless the business still more, enabling me to make money for the work. This will be my delight." Asks Dowie to pray for him that he be guided aright, and says, "I am greatly indebted to you for writing to me, taking so much interest in me to answer my letters so fully. * * * You cannot tell how much your letters help and encourage me. Will you specially ask God to anoint me for the work here? I greatly long to be used of God in this country, and I fear to go forward before He sends me. * * * I feel somehow greatly drawn to you in the Lord. Although we have never met in the flesh, I trust God will open my way to do so."

Then appear two short letters of Stevenson to Dowie of March 19 and 28, asking for certain back numbers of the Leaves of Healing, and for "Divine Healing Vindicated," and other books. Other letters written by Stevenson be-

11

tween March, 1895, and December 7th, 1899, are not produced in evidence, nor are any letters between those dates written by Dowie if any he wrote.

It appears that the young lady referred to in the letters as Elizabeth Daubney, whose spine was affected, came on from England to Dowie's Home, for treatment, about the month of July, 1899.

She states that Dowie repeatedly asked whether she had heard from Mr. Stevenson, and stated to her that he had himself had a pleasant correspondence with him, but that he had been too busy to write him.

Stevenson wrote to Miss Daubney a letter in the fall of 1899, and sent her his photograph, and also some specimens of lace, saying she might, if she wished, show the same to Dowie, which she did.

Dowie thereupon exhibited this lace at one of his meetings to his congregation, and spoke of the probability of the establishment of lace industries in the coming City of Zion.

At about this date Dowie himself received a letter from Stevenson written December 7th, 1899, in which he says, "I am sending you your New Year's gift." The New Year's gift consisted of a sum of money, which was contributed by members of the family whose names were attached to the letter, each one contributing a dollar (twenty-six dollars in all) except Samuel Stevenson, who contributed fifty dollars. He regrets that his eldest brother, William, is not yet converted, but says, "I send Leaves of Healing weekly to him, and as a result they have just discontinued eating swine's flesh. * * * I am very much persecuted here, they have for many years called me "Faith Healer" and "Anti-Pork Eater." * * * We daily pray for you. * * * I wish many times my boy could be educated at Zion."

After the receipt of this letter Dowie sought an interview with Elizabeth Daubney, appointed an evening for that purpose. In that interview (which lasted fully two hours) Dowie occupied the time in questioning her as to Stevenson, his home life, his family, his business methods, asking and obtaining from her all possible information concerning Ste-

venson. Dowie admits this interview and the correctness of Miss Daubney's statement, saying himself upon the stand that he went into the subject of Stevenson "very exhaustively." It is a reasonable inference from the evidence, that Dowie at this time determined, if possible, to get Stevenson to bring his lace industries to this country, but not with the intention of swindling him out of the same, as charged in the original bill.

Immediately after his interview with Miss Daubney and under date of December 20, 1899, Dowie wrote to Stevenson a very long letter of over three thousand words, acknowledging the receipt of the letter of November 23rd, (which is not in evidence) in which he says: "This was the decision for which I have been long looking and praying in your case, namely, that you might be led by the Spirit of God to enter into our fellowship, to come to Zion spiritually first, so that in all its glorious fullness you should truly be one with us in all the aims of Zion for the redemption of humanity.

"It may seem strange to you that I have not answered your letters, and still more strange when I tell you that there are none of my correspondents in Europe, and none in England in whom I had more interest than in yourself; for from the very beginning I have prayed that God would lead you to Zion and give you the desire to establish your beautiful industry among us as one of the leading features of Zion's manufactures; * * * my heart has been drawn to you all the way through, and it has been so with all of those with whom I have converged about this matter, and it has given them great delight to know that you have now made application for fellowship and that you are coming to Zion." He expresses his gratitude to God for Stevenson's decision concerning the doctrine of eternal punishment, or rather of eternal hope. It appears that Stevenson had previously written to Dowie that that was his chief difficulty in surrendering himself to Dowie's religious views, but that some letter of Dowie had converted him upon that point. Dowie speaks of it as a point "at which all hindrances were swept away."

He then quotes scripture to show that "the power of Jesus extends over *all flesh,*" etc.

In this letter he speaks of making it a joy "to gather together from the east and from the west, and from the north and from the south, into cities of Zion in every land, which cities shall be the training ground for hosts of Zion messengers to all the earth," etc., and "I have long been convinced that until the theocracy was proclaimed and a people brought together who would declare that Christ, and Christ alone, was their King, that while living peacefully and submitting themselves to every ordinance of man, *so far as it did not conflict with the law of God,* they would at the same time proclaim the supremacy of that law, and demand submission, unconditional and universal, to the claims of God. Such a people must be created, for outside of Zion they do not exist, so far as I know. * * * We aim in Zion to create, not merely *high Christian character in a few, but high and noble and pure and holy life in all.* * * * I believe it is possible, and indeed I see it brought out before my eyes, that a whole people can be organized into a united army for the extension of the Kingdom of God even while they pursue their daily calling, often in secular life, and maintain happy homes and raise Godly families; * * * it is only *within a short time that I have realized what my mission is,* although I am quite aware that still fuller revelation of His will awaits me when I have fulfilled the task so graciously assigned. * * * God is fulfilling the surer word of prophecy in sending forth the call to repentance, faith and obedience. * * * In preparation for 'the times of the restitution of all things which God has promised by the mouth of all his holy prophets since the world began.' * * *

"The establishment of the Christian Catholic Church has been for Zion in all the lands. * * * And now this brings me to the place where I feel, as your general Overseer, that it is my duty to address to you a call to service. It is this: Come as soon as ever you can to America, and be my guest in Zion Home, and see the site of Zion City, and investigate for your-

self the condition of your special manufacture and the prospects for success of it in America.

"This seems to me to be the wisest course to pursue. Either here or in Great Britain a large capital must be raised no doubt, in addition to what you have for the establishment of your industry on so great a scale as would be necessary to make it a leading industry in Zion City. * * * I want you to bring with you the introductions which will enable you to ascertain the conditions of the lace manufactories of America." Asks him to talk with any Christian men in England who would be likely to place capital in such an enterprise, although he warns him not to commit himself. "Sell your skill and brains no longer to financial Shylocks." Writes that he has sent him a telegram that day which will read as follows: "Welcome to Zion. Letter sent. Remember night with God. Come soon." The postscript contains an acknowledgment of a letter of December 7th, with draft of fifteen pounds, ten shillings, and returns thanks for same. Speaks of the fact that the Chicago Chronicle has discovered the site of Zion City, which had been kept secret up to that time.

Mr. Stevenson, while upon the stand, testified as to the contents of the letter of the 23rd referred to, said letter not being produced, in substance, that he wrote to Mr. Dowie, telling him about his troubles with Frank Woodward, to whom he owed six thousand pounds, and that he suggested to Mr. Dowie whether he could loan him this six thousand pounds, "because I felt I would like to give him more of my profits, give him a good large share for the loan of his money."

There were offered in evidence some of the letters brought by Stevenson, or sent at his request to Dowie, one from Simon May & Co., of Nottingham, another from Edward Hawlow; one from S. I. Bembridge, one from George Middleton and one from Frank Woodward; all testifying to complainant's fine business standing and character for honesty and integrity and ability as a lace manufacturer.

Another letter was put in evidence that was sent by Woodward to Dowie under date of July, 1900, referring to his previous letter to Dowie, and stating a conditional withdrawal of his former letter, to which reference will be made hereafter.

Stevenson arrived in Chicago the —— day of January, 1900, and upon his arrival at Zion, he found a letter from Dowie awaiting him, stating that he had written to Deacon Judd and Deacon Sloan to pay him every attention in their power and take him out to see the city, and "I have a very strong conviction, my beloved brother, that your beautiful industry will be one of the most prominent manufactures in Zion City." That should he desire to come out and see him at Ben MacDhui (from which place the letter was written) he invites him to come as he, Dowie, will not return to Chicago until the 26th.

Within a few days after his arrival in Chicago, Mr. Stevenson went to Ben MacDhui, where he remained the greater part of his time. Dowie, being in Chicago, writes to Stevenson under date of April 5th, 1900, to say he has directed Mr. Packard to prepare the necessary papers of incorporation with capital of one million dollars, to be entitled "Zion Lace Industries," and that it will be filed at once in Springfield with his own check for $1,000 fees. That he has found it "necessary to make some changes in the proportion of capital stock, which I must acquire in the concern on behalf of Zion, but I have made no changes whatever in the proportion that is assigned to yourself." Writes him of the success on the last Lord's Day, receiving eighty-four new members, etc.

Stevenson replies to this on the 6th of April, hopes he will succeed in taking in the lake front Dowie has spoken about; that he, with Mrs. Dowie's consent, has been acting as clerk "of your works," then proceeds to suggest various improvements as to the sloping of the lawns, cutting down hills, etc., so as to give views, and says: "My dear little girl is better and is very dear to me. I am so glad to have had this nice time with her." (The "dear little girl" is supposed to be "Miss Methie Dowie.")

Two or three days after his first arrival at Ben MacDhui, Stevenson testifies that Dowie asked him into his private office one evening about nine o'clock, and there questioned him very closely as to his life, his mother, his brothers. They had prayed together. Then he told him all about his business, that he was not an educated man, a selfmade man, told him all that he could, kept nothing back; gave him the testimonials that he had brought from England, etc. Then they prayed again. "Mr. Dowie, in speaking of the work, wept, and said his heart was in the work of the Lord, and he was glad to have me there, and he wanted such men as myself to help him in this great work; men who were not only Godly men, but men who were successful in business, and he was very glad that I had come; and he commanded me then to come to Zion and to help him in this work, and to be his righthand man."

Stevenson told him he would have to sacrifice a great deal, his friends and his work in England, and suggested whether he couldn't work the business in England and send Dowie more money so as to be associated with him more closely. To which Dowie replied, "No, I want you here with me. You can do more good in this country and help me to build up Zion City, and your lace industries will be a new thing here; and you are in sympathy with my views so much, that I won't have any trouble with you in getting you into my mind and my way of thinking." This conversation lasted till three or four o'clock in the morning. Stevenson says, that "He spoke very kindly to me and put his hand on my head and blessed me in the name of the Lord, and I asked him to pray for me that the Lord would guide and direct me, because I did not want to take this step unless it was clearly shown to me by the Lord."

The next week Stevenson returned to Chicago, investigated the stores, prices of selling laces, etc., and attended meetings at the Tabernacle; was often at Zion City.

Dowie introduced Stevenson to the audience at these meetings, and told the people that Stevenson was coming to America. Stevenson wrote him a letter in which he re-

quested him not to make any statements in public in that regard until they had further arranged.

Stevenson testified that he had a number of conversations with Dowie during January, February, March and April, and that he told him he wanted to be quite sure in his mind before he consented that it was God's will, and speaks of one all night session, and one or two sessions that lasted two or three hours.

In one interview which has been referred to at Ben Mac-Dhui, he testifies that Dowie says: "Why, if you come here, you will be an overseer, the lace industries would be so large that you will be an overseer in such a large undertaking." That he ordained him a deacon and officer of the church before he, Stevenson, left Chicago, on his return to England.

It appears that in February, 1900, an exhibition of laces that Stevenson had brought over of his own manufacture, was had in the "Hall of Seventies," and thousands of people saw those laces. Stevenson was there every day, explaining, and telling them all they wished to know about the Zion Lace Industries, and in one of these meetings in that hall he addressed the people about the industry and about his work in England.

In one of these all night sessions, after they had finished their business talk at about 4:30 or 5 a. m., Mr. Dowie asked Stevenson if he had any one in England in view of marriage, and he told him, no, but Dowie brought Stevenson to confess he was in love with Dowie's sister Methie. Dowie told him he could not have her. Then Stevenson replied, "If you don't think that is a good thing for me, you pray to the Lord and ask Him about it, and if you don't believe it is right, why, no more need be said."

It appears that about two days after this conversation, Stevenson and Miss Methie Dowie became engaged to marry.

On the 11th day of April, 1900, Dowie wrote a general power of attorney, "To Whom It May Concern," stating that Stevenson had been appointed managing director of Zion Lace Industries, Zion City, near Chicago, United States of America; that the association was incorporated under the

laws of the state of Illinois, and capitalized for one million dollars, and the factories to be built upon a splendid situation on the shores of Lake Michigan; that Mr. Stevenson was authorized by him, Dowie, to enter into contracts and to place orders for machinery and material of every kind. Gives reference as to his own financial and business standing to the Bank of Scotland, London, who are agents for Zion City Bank, and signs said document, "John Alex Dowie, President Zion City Bank, Zion Land & Investment Association, Zion Lace Industries." "This certifies that the bearer, Mr. Samuel Stevenson, is a duly ordained Deacon in the Christian Catholic Church in Zion."

Also a letter of the same date written by Dowie, directed to Mrs. Ann Stevenson, the mother of Samuel Stevenson, in which he tells her of "his eventful three months' visit to us in Zion, which is terminated this day in the making of an agreement by means of which he transfers all his interests in business to this country, and will be associated with me in the establishment of a great Zion Lace Industry," and of Stevenson's engagement to Miss Mary Dowie.

There is evidence tending to show that Stevenson was exceedingly cautious about entering into any agreement to sell or remove his factory to America, and that he complained that he could not get a definite offer or proposition in reference thereto from Dowie, and to the effect that he intimated that unless he did within a very short time, he should return back to England. Dowie and Stevenson arrived at an agreement which was incorporated in the contract dated April 12th, 1900, and the next day Stevenson left Chicago for England.

In the opinion of the court the contract of April 12th was not only *not* an unreasonable one, but was a highly beneficial one to Mr. Stevenson.

The evidence tends to show that the value of Stevenson's plant in England, without regard to the good will was about $60,000 to $65,000. By the contract of April 12th he sold to Dowie a certain part only of its machinery,—the most valuable part, his patents and patterns for $50,000, reserving

the right of selling for his own benefit certain parts of the machinery not sold to Dowie then remaining in England, which he afterwards sold to Dowie for $35,000.

By the contract of April 12th Stevenson was to attend to the transfer of the plant to America and both parties apparently agreed that the so-called good will and the loss that Stevenson might sustain by reason of such transfer, including his services in making the same, was worth the sum of $100,000 *in stock* in the proposed corporation, so that in effect he got according to that contract, $50,000 for part of his plant; $100,000 in stock of the corporation of one million dollars that was to be formed. Stevenson, upon the stand, testified he was satisfied with that contract, and his amended bill, which he after the argument has asked leave to file is founded upon the validity of said contract of April 12th, 1900.

Before said motion was made, the court, in preparing this opinion, had decided that the contract was valid, and that no "undue influence" was exercised by Dowie.

In order to determine whether there was "undue influence" exercised by Dowie over complainant, which induced the execution of the two agreements of date August 4th, 1900, it is necessary to examine into the further relations, social, business, and spiritual, of the parties, from the execution of the agreement of April 12th, 1900, to the 8th day of August, 1900 (when the agreements of August 4th were executed), and all the evidence bearing thereon.

During Stevenson's first visit to this country, extending from about the 20th of January to the 12th of April, 1900, several articles appeared in Dowie's Leaves of Healing, exploiting the proposed Zion Lace Industries and the exhibition of laces brought over by Stevenson referred to, and in all these articles much was made of the fact that they were to be under the management and control of Samuel Stevenson, who was praised in the most fulsome language as a skilled manufacturer and successful business man of which the following is a sample, dated February 10th, 1900. Speaking of the lace industries, Dowie says: "When all things were

ready, we cabled to Europe for a captain of Zion industries upon whom we have been fixing our eyes for *about five years*, Samuel Stevenson, a successful manufacturer of Beeston, Nottingham, England, a member of the Christian Catholic Church in Zion, and a man of much skill, many inventive faculties and resources, and great executive ability.''

In another issue he speaks of Deacon Samuel Stevenson having left Chicago for England, and ''we expect to welcome him back to this country early in July next.''

The fact that application had been made for the incorporation of the Zion Lace Industries, with capital of one million dollars was noticed, and that Mr. Samuel Stevenson was appointed managing director and was in England then attending to the business.

And in the same issue notice is given that although many applications have been made for the purchase of stock in the Zion Lace Industries, none had been sold, but the controlling interest had been acquired by Dowie in behalf of Zion, and that books for the sale of the stock would soon be opened.

The evidence shows that application was made for articles of incorporation on the 5th day of June, 1900, at Springfield, Illinois, signed by John Alexander Dowie, H. Worthington Judd and Samuel W. Packard; the necessary authority issued, subscription books opened, Dowie subscribing for 9,996 shares at $100 each, Charles J. Barnard, Carl F. Stern, H. Worthington Judd and Samuel W. Packard one share each; that papers showing that the incorporation had been completed and a board of directors elected on the 4th of June, consisting of John Alexander Dowie, H. Worthington Judd and Charles J. Barnard were filed with the county clerk on the 5th of June, 1900.

The publications in the Leaves of Healing in regard to the Zion Lace Industries continued at intervals after Stevenson returned to England, and many of them contained the most rosy views in regard to such industries. In the June 9th issue, the editor, Dowie, makes reference to the incorporation under the laws of the state of Illinois, predicts it will be a great dividend-payer and refers in complimentary terms to

Stevenson and his success in carrying on the lace industry in the old country. This is the publication which caused Woodward to write the letter referred to heretofore, recalling his letter of recommendation of Stevenson.

Stevenson wrote to Dowie at frequent intervals from England, reporting the progress he was making as to the transfer of the plant, the engaging of experts, ordering new machinery, etc., all of which letters clearly indicate that he had come to believe that God was guiding his every step and that he was doing God's will in the work of transferring the lace industries to Zion.

His letters upon his return generally end with, ''Yours faithful in Jesus,'' in place of ''Yours sincerely in Jesus,'' as theretofore.

In one of his letters he speaks about having paid off Woodward and says: ''I told him (Woodward) I had met a lady out there and was determined shortly to be married. I was going to manage a large dry goods establishment, was to take out my two brothers, some machinery,'' etc.; that he had asked Woodward to write Dowie a letter as he wished his friends down at Methie's home to be assured of the fact that Methie was marrying an honorable man, and he says, ''Woodward evidently thinks you are Methie's father, and I am going to manage your business, as you are an old man,'' and he desired Dowie in replying to Woodward, to say nothing about what we are doing, as he, Woodward, had sent for him and wanted to buy his business. And in the same letter in which he relates the untruth told Woodward, he concludes with ''I feel God is with me. * * * You must be praying for me, I feel sure, I am so happy. * * * People are calling me a fool and many things, because I am leaving such a good business, etc. * * * They say I must be mad now and clean gone; no one but a fool or a madman would do such a thing, leave such a trade and business, they say, but I smile and go on.''

Dowie responded to some of these letters in his old style, and in one of them tells how he has made arrangements for his party of ten, consisting of himself, wife, son and daugh-

ter, Stevenson and his wife, making six in the first cabin; and Miss Gaston, Carl Stern, O. T. Spreicher, private secretary, and Ernest Williams, expert stenographer and photographer, making up a party of ten, and recites, apparently with great glee, a deception practiced upon the steamship company, in which he managed to get his entire party the privileges of the first cabin (which was not allowed by the ship's regulations) by passing off the last named persons as servants or valets.

It, is evident that in the incidents referred to, the commercial instincts of both Stevenson and Dowie got the better of their religion.

Stevenson in one letter speaks of Dowie's contemplated visit which Dowie had told him had been fixed, to start from this country the 14th of August, but "all the people I have spoken to ask me why you use such very strong language, they think it very dreadful to say 'you dirty devil,' and use such words as 'cur' and 'infernal liar.' * * * But, however, they believe you are a man of God and that the signs do follow, and so they are just waiting to see and hear you."

In another letter he says, "It is remarkable to all how wonderfully God is working for me."

The letters referred to, written by Stevenson while in England upon his return trip, manifest an increasing fixed conviction that he is being guided by God, and that it was the will of God that he should do the work that he was engaged in. They show an increasing and growing affection and confidence between him and Dowie.

Stevenson, under date of June 21st, 1900, writes to Dowie that he is obliged to arrange to bring out the four extra machines, "as I found I could not sell without losing extra much." And that he has a nice set of experts promised to go. Tells of his going to Scotland and other places and of the great facilities he enjoyed for seeing the operations of other factories. Among other things he says that at one factory, where he saw a thousand girls working a thousand weaving machines in one room, "God made this man (the manager) willing to take me through, a thing unheard of

before,'' and that he had a similar experience and had obtained some valuable information at Manchester, all of which he attributes to the divine efforts to aid him in his work.

Stevenson arrived at Zion Home on his return trip to England, on the 10th day of July, and in a day or two thereafter left for Ben MacDhui, Dowie's summer residence.

After Stevenson's return from England, he was put very prominently forward and exploited in connection with the contemplated Zion Lace Industries. Meetings were held in which he told of the progress that had been made and a very considerable enthusiasm was aroused by means of editorials in the Leaves of Healing, and reports of such meetings.

On the 24th of July, Stevenson was married by Dowie to Methie Dowie in Zion Tabernacle in the presence of three thousand people, and a fulsome account given of the same in the Leaves of Healing on the 28th of July, 1900. In this same issue he states that ''Zion City Bank will soon issue a circular and invite subscriptions for $400,000 of Zion Lace Industries stock.

''We have determined not to go forward with the incorporation under the laws of the state of Illinois, but to establish the industries on the basis of an agreement between ourselves and the stockholders, as in the case of the Zion City Bank and the Zion Land & Investment Association. * * * We may say for the information of our friends, who are greatly desiring to enter into an association with us in Zion Lace Industries, that we shall issue stock at $100 per share, guaranteeing a minimum interest of six per cent. for the first year, and an almost certain dividend for six successive years of one per cent. annual increase, asking the dividends to increase therefor to twelve per cent.'' The ''We'' must be the editorial ''we,'' as it does not appear that Stevenson had been consulted about this publication.

In the same issue Dowie calls attention to Cashier Barnard's advertisement on page 425 of the same issue, and continues: ''We frankly tell our many friends that this first issue of Zion Lace Industries stock of $400,000 will be very rapidly subscribed for, and that all who desire to enter into

co-operation with us in this splendid industry, had better send in their applications as soon as possible.''

Describes the wedding four days before, and says: ''Deacon and Mrs. Stevenson have crossed Lake Michigan to our summer home of Ben MacDhui on White Lake. They will return to the city in time to attend our closing discourse on Lord's Day, August 5th, when he (Stevenson) will be present and speak a few words at the farewell meeting on Monday, August 6th, and to take part with us in our final reception at Zion Home on Tuesday evening, August 7th.'' That, ''God willing, we will leave Chicago on Wednesday, August 8th, for New York, from thence to sail * * * on the morning of Saturday, August 11th.''

Stevenson returned to Chicago at the time indicated, and some sort of talk or negotiation was had between Dowie and himself and Packard, in regard to the preparing of the articles of association, indicated in the publication last referred to, but it is not shown that he knew of such publication. The evidence tends to show that while Stevenson suggested some changes in the phraseology in the wording of the public agreement, the two agreements were ultimately prepared by Packard, substantially in the condition in which they were signed, and were brought by him on the evening of August 8th to Dowie's home, that being the last evening before Dowie and his party, Stevenson and his wife were to leave Chicago on their trip to Europe. It appears that Dowie was in Chicago; and Stevenson and wife were at Ben Mac Dhui from the day of the wedding, July 24th, up to August 5th, and were down town in Chicago shopping on the 8th of August, up to five or half past five of that day, and upon their return to Dowie's home, found Dowie and Packard awaiting them.

The evidence as to what took place on that evening of August 8th is conflicting, the weight of evidence tending to show that either the so-called public agreement was read, or the substance of it stated to the complainant, and some blanks filled; Attorney Packard stating that the reason for the blank as to the price agreed upon between Dowie and

Stevenson for the four extra lace machines, which he had brought over from Europe, was unknown to him; that when it was stated to be $30,000, he himself suggested as hereinbefore recited, that it made $35,000, in order, as he said, to make up the $50,000, the amount of Stevenson's ante-nuptial note, which he had given to Dowie as trustee, and the payment of which that evening was contemplated.

The evidence tends to show that the so-called private agreement was also either read, or the substance of it stated, but Stevenson swears that nothing was said about such private agreement, and that it was not read, nor the contents stated to him upon that evening. As I have before remarked, Stevenson's evidence as to what took place that evening in regard to said agreement is unreliable, but his entire subsequent conduct was consistent with the idea that he knew nothing of such private agreement until after the breach between him and Dowie, when it was shown to him by Packard in the month of June following.

His testimony shows that he had no clear recollection as to the occurrences of that evening, nor as to any conversations or any talks about the proposed agreement then or prior thereto. Having been married but a few days previously and having been lionized in public and in private as the great lace manufacturer, and living in close communion with Dowie, he was in such a state of excitement, an ecstacy of bliss, that he would have signed any instrument that Dowie might have requested him to sign.

There can be no question in the mind of the court but what the two agreements were signed upon the evening in question by all of the parties signing the same, but the question in this case is not whether Stevenson signed both these agreements upon the evening in question, nor whether he intended to execute them, but the question is how the intention to execute the same was produced; whether he knew the force and effect of the instruments he signed, and also whether full information and advice was given him by Dowie and his attorney, which they were required to give him under the circumstances; whether or not, considering all the circum-

stances surrounding the transactions, when taken in connection with the proof as to the relations existing between the parties, there was such dominion exercised by the defendant Dowie over Stevenson as prevented its being the pure, voluntary, or well understood act of his (Stevenson's) mind.

"The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed." (Citing the celebrated case of *Huguenin v. Baseley* [17 Vesey, 273], *post.*) "It is specially active and searching in dealing with gifts, but is applied when necessary to conveyances, contracts, executory and executed, and wills." (2 Pomeroy's Eq., sec. 951).

"Whenever two persons stand in such a relation that while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached, if no such confidential relation had existed.*" (Same, sec. 956).

After commenting upon the doctrine of undue influence in the cases of guardian and ward, trustee and beneficiary, attorney and client, etc., he says, sec. 963, under the head "Other Relations":

"The same general principle extends with more or less force to dealings between physician and patient, a spiritual adviser and penitent, * * * partners, and indeed all persons who occupy a position of trust and confidence, of influence and dependence in fact, although not perhaps in law."

Where the relation is proven to exist, as in the case of the clergyman and his parishioner in *Huguenin v. Baseley, ante,* it (the undue influence) is presumed to exist, and the burden of proof or "heavy burden of proof" as it is termed, is upon the clergyman or person occupying the confidential

or fiduciary position to show that in the transaction complained of, the influence had not been exerted, or the confidence reposed abused. But, whether the burden of proof in this case is upon Dowie, who not only occupied the position of clergyman to his parishioner, but also of prophet to his disciple, it is unnecessary to discuss in the view the court takes of the evidence adduced.

The court, in a case of this character, looks, first at the transaction to see whether it is a contract which was a reasonable one, a beneficial one, whether there was a reasonable consideration for the making of it.

While the fact that a contract is unwise, foolish, improvident, will not of itself justify a court in relieving the party from the effect of such contract, yet, if the court can see there is a want of consideration, or a very inadquate consideration, such fact should be taken into consideration with other inequitable incidents in determining whether the party was induced to enter into the contract by reason of the undue influence exerted over his mind by the other party to said contract.

The complainant at that time was in this position: He had a right to receive $100,000 of paid up stock in a joint stock corporation of one million dollars; he was entitled to receive a balance of $15,000 upon the first sale of machinery to Dowie. He had brought over with Dowie's knowledge and approval four additional machines for the purpose of their being placed as part of the plant, for the joint stock incorporation of one million dollars, and it was only a question as to the amount which Dowie should pay him for the same.

Stevenson had the right to have all the provisions of the agreement of April 12th, 1900, under which the Zion Lace Industries had been incorporated, carried out. Under that agreement Dowie was not only bound to incorporate the joint stock association of one million dollars, but also, after it was incorporated, to convey or transfer to the corporation, a tract of land upon the Zion City site, containing not less than twenty-five acres, and all the machinery, patterns, good

will and plant purchased from Stevenson, including the patents, for which he (Dowie) was to have $620,000 of capital stock, $100,000 of which he was to deliver as full paid stock to the complainant, the balance of the capital stock, $380,000, to be treated as treasury stock and sold or used for the purpose of putting in further machinery, tools, buildings and appliances.

There was also a guaranty on the part of Dowie that he would either subscribe for or purchase at its par value such treasury stock, or so much thereof as might be necessary (or procure some person so to do) in order to furnish all the capital required by the corporation to enable it to purchase and pay for all buildings, new machinery, tools and appliances, which it might need, and to enable it to successfully inaugurate and carry forward its business to the full maximum limit of its opportunities and possibilities. Therefore, Stevenson had a right to demand, not only a transfer of all the property to the new corporation, but that Dowie should, if necessary, himself furnish cash to the full amount of the treasury stock, $380,000.

By the transaction contained in these two agreements of August 4th, he, Stevenson, releases Dowie from all his obligations, and surrenders all his own rights thereunder.

Under the incorporation, he would have all the rights of a stockholder under the laws of the state of Illinois; the right to examine books, the right to have the property of the corporation applied for the purposes of the corporation, and that it be used for no other purpose; the right to attend stockholders' meetings, to vote thereat, and the right to go into a court of equity at any time that he deemed it necessary to check or question any *ultra vires* or illegal act of the corporation. He had a right to have the management of the corporation in the hands of a board of three directors.

The public agreement or contract, the only one that was published to the world, and the only one known to the so-called subscribing shareholders, purported to be an agreement between John Alexander Dowie and Samuel Stevenson of the one part, and the preferred shareholders of the other,

and twice speaks of the association as a *joint enterprise*. If it was not a joint enterprise, Stevenson and Dowie on one side, and the preferred stockholders signing the same on the other, in fact, it was deceptive and it is by no means clear that, if it is to be held to be a valid agreement, Samuel Stevenson could not be held liable, either as joint contractor with Dowie, or as having guaranteed by his signature thereto the performance of all the covenants and obligations devolving upon Dowie by the terms of that agreement.

That public agreement, the only one that was published, does not contain one word as to the interest of Samuel Stevenson in the new association, and it is a fair inference from the same, and the public would be justified in believing, that there was some kind of an arrangement or agreement existing between himself and Dowie in the nature of a co-partnership or joint enterprise, not incorporated in the agreement, which induced him (Stevenson) to become a party to the same.

I am strongly inclined to the opinion that in a court of equity, he, Stevenson, would be liable to any person dealing with said association, either as a subscribing stockholder, or as a creditor thereof, for any damages they might sustain in trading, with a knowledge only of said public agreement.

By the new agreement Dowie is relieved from his obligation to buy or cause to be purchased at par $380,000 worth of treasury stock in the corporation, and does not, in the new agreement, undertake or bind himself in any way to Stevenson to furnish any land or money to the establishment of such industries; and instead of a one-tenth interest in a corporation of one million dollars, Stevenson, under the new public and the private agreement, agrees to receive $100,000 of paid up stock in a new association; an association which is without any limit as to the shares of stock, which Dowie alone is authorized to issue; it provides for $500,000 of stock in shares of par value of $100 each, to be issued to Dowie as proprietary stock; seventeen hundred shares of stock to be issued and to be known as common shares, and authorizes Dowie to issue one hundred shares of preferred

stock, without any limitation whatever, and the new agree-
ment expressly provides that no other shareholder than John
Alexander Dowie shall have any title or interest, either legal
or equitable, or possession or control of any assets or prop-
erty, real or personal in said Zion Lace Industries, nor any
right, authority or power to make any sale, transfer or dis-
position thereof, and gives Dowie full authority to manage,
lease, sell, exchange, mortgage, and convey from time to time
the real and personal property of the industries, or any part
thereof, as he shall deem best, and provides that the pur-
chaser or mortgagee shall not be required to see to the appli-
cation of the purchase money.

Instead of being the owner of $100,000 of paid up stock
in a joint stock corporation of one million dollars capital
stock, Stevenson becomes a shareholder in an association, in
which John Alexander Dowie owns all of the property, ap-
points all of the managers and employees, fixes all the sala-
ries, and he is, as such shareholder, without any voice of any
nature or kind in the management of the association, or any
right, to inspect the books of the association or challenge in
any way Dowie's action. This "Zion Lace Industries" asso-
ciation has, legally speaking, but three assets, to wit: (1) The
credulity of human nature, which appears to be an inex-
haustible asset; (2) The avarice of investors; and (3) A
blind faith of members of his church in John Alexander
Dowie.

What consideration can it be said Stevenson received for
the surrender of his rights under the million dollar corpora-
tion? Not one dollar of consideration or advantage to him
of any nature or kind can be pointed out. It is all surren-
der on his part and all gain by Dowie.

It is true that the agreements in question provide for the
purchase by Dowie of the four lace machines at $35,000, but
those were the property of Stevenson which were to go into
the incorporated company and to be paid for, either by
Dowie or by the incorporation. Eliminate the four machines
and the payment therefor, and it is apparent on the face of
the agreements, that for this change of his situation, Steven-

son received no consideration whatever. It was in legal effect a gift by Stevenson to Dowie of all his property, rights and interests to which he was entitled under the agreement of April 12th, 1900, and all his property rights in the corporation which had been formed thereunder.

Is it a transaction—this of August 4th,—which any reasonable, prudent, cautious business man, uninfluenced by any other consideration than to make a bargain, would have entered into? The answer must be in the negative.

The two men were not equals (irrespective of the question of undue influence) in business capacity or in intellect. In the words of his counsel, Mr. Packard, "Stevenson was no match in business affairs for Dowie; and who is?"

Dowie's attorney may well admit the inequality of the two men. The one a strong man, well educated, of large business experience, having lived in several lands and having traveled much and been brought into contact with all classes of men; the other, Stevenson,—by no means a strong man—of but little education, no business experience and no knowledge of the world outside of his lace manufactory at Beeston, England; the one was truly "no match" for the other.

It is true that the law nor the courts can give a man brains, or make one man equal in business capacity or intellect to another, and if there is nothing more than such disparity between the two men trading, the fool must be left to the effects of his own folly. But when they are unequally matched and there are other considerations entering into the transaction growing out of the relations of the parties, one to the other, the question of fairness of the transaction, as well as the natural ability of the parties, must be taken into consideration.

There is another matter to be referred to in considering what Stevenson surrendered and what he got by the change that was made in the business relations of the parties on the night of August 8th by abandoning his rights under the old corporation, and consenting to go into a new arrangement, and that is, that he is a party to this contract of August 4th, termed the "public agreement," by which he and Dowie

have undertaken (or Dowie alone had undertaken) to carry on an enterprise in a new association which stands of record at Springfield, Illinois, and on the records of this county, of an incorporation provided for in the agreement of April 12th, and which was actually formed, to wit: the Zion Lace Industries.

Was that matter brought to Mr. Stevenson's attention? It is true that the public agreement provides that only Dowie shall be liable for the debts and that notice to that effect be kept posted in the office so that all persons entering there may see the same, but suppose a party dealing with the association, known as the Zion Lace Industries, does not enter into this office, and becomes a creditor of the Zion Lace Industries, relying upon the fact that there is such an incorporation organized under that name, recorded at Springfield, and upon the records of Cook county. There could be little question but what John Alexander Dowie, Samuel Stevenson and everybody connected with the management of the enterprise could be held liable for a debt contracted under such circumstances. It is practically holding out to the world, to those who do not enter the office and see this posted notice, and who do not have actual notice of the articles of association, that this "Zion Lace Industries" is the "Zion Lace Industries" incorporated under the laws of the state of Illinois. As to such creditors, it would come pretty near being a case of "false pretenses."

Did John Alexander Dowie dominate the mind of Samuel Stevenson in the transaction of August 8th?

We have traced from the commencement of their correspondence the growth of the spiritual influence exercised by Dowie over Stevenson which culminated in his becoming a member of Dowie's church and the church of Zion, of which he was the recognized head, we have seen that he became gradually at last fully converted to the doctrine that Dowie had upon this earth a divine mission; that Dowie, when he spoke, spoke as he states it, by authority, with the consciousness of authority, with the right to demand or to command in the name of the Lord and expect obedience. Dowie had

told him that under God he had committed himself to the
formation and establishment of institutions of a permanent
character in America, in connection with his ministry in the
Lord, and, in substance, that he expected to gather people
from the east and the west, from the north and the south,
into the cities of Zion in every land, and that he (Dowie)
had long been convinced that "until a theocracy was pro-
claimed and a people brought together who declared that
Christ and Christ alone was their King, and that while liv-
ing peaceably and submitting themselves to every ordinance
of man so far as it did not conflict with that of God, they
would at the same time proclaim the supremacy of that law
and demand submission unconditional and universal to the
claims of God. Such people must be created," for, says
Dowie, "outside of Zion they do not exist, so far as I know."
He told him that it was only within a short time that he had
realized what his own mission was, and that he expected
further revelations on that subject.

Stevenson testifies, in substance, that although John Alex-
ander Dowie had his business cabinets and heads of depart-
ments, that there was no will in Zion except that of John
Alexander Dowie; that he was absolute dictator and no one
presumed to question what he said or ordered.

It is true that Dowie himself denies this, and protested,
not only upon the witness stand, but in public meetings, that
he only ruled by love, but, when he speaks about the au-
thority of God and demands obedience, who in his church
would say him "Nay," in spiritual or in temporal matters,
connected with the business enterprises which he professes
to carry on for the benefit of Zion, and in the cause of his re-
ligion?

Upon the stand, on cross examination, he gave an idea of
his method of conducting his business operations. He is
at the head of thirty-eight different departments of industry
in this coming City of Zion, and in Chicago. He conducts a
bank, known as the Zion City Bank.

The public agreement of August 4th, organizing the new
association was based, to a large extent, upon that under

which the so-called Zion City Bank was doing business. The articles of agreement, as to the bank, were put in evidence, and, in substance, they simply provided that John Alexander Dowie might issue $100 shares of stock and sell them without limit as to the amount of such issue; he, individually, agreeing to pay interest on the shares so issued, and with certain covenants for the redemption of such shares, similar to those contained in the public agreement of August 4th.

He owns all the moneys and assets of the bank, employs officers and other employees, fixing their salaries, and has the power to make any disposition of the assets of that bank, just as great as any individual has power over his own private property.

And it is the same way with the other industries referred to in Zion. The evidence tends to show that in furtherance of his scheme to build the City of Zion, John Alexander Dowie purchased some five or six thousand acres of land on the shores of Lake Michigan, a few miles north of Waukegan, a sandy desert, and in many places swampy; that he organized the Zion Land & Investment Association, subdivided 850 acres of the land into 50-foot lots, gave 1100-year leases upon each lot, and sold those leases at a price equal, it is stated, to the value of the property; and in five days after these lots were put upon the market, every lot in that 850 acres of land was taken.

The title to the land, it appears, remained in John Alexander Dowie. The title to the land upon which these industries are to be situated under this public agreement of August 4th, remained in John Alexander Dowie, and it appears in a most remarkable argument—which was published—made by his attorney, Mr. Packard, upon the advantages to the subscribers for preferred shares of stock in that kind of an association over preferred stock in an incorporation organized under the public laws of the state, that he had provided by the will of John Alexander Dowie, that this land upon which the Zion Lace Industries (and the lots referred to were located) should pass to his successor named in the will,

who should appoint trustees and those trustees with their successors were to hold title until "the second coming of our Lord Jesus Christ;"—a rather indefinite period of time, and for that reason obnoxious to the "rule against perpetuities."

But the attorney of the defendant contends that it is a *pious trust* that is thus created. Parties will not be allowed to speculate in real estate, lace industries, and other manufacturing plants under the guise of *"pious trusts,"* and thus avoid the rule against perpetuities.

The different departments referred to, at the head of all of which was Dowie, it appears were connected by telephone with Dowie's office, and that no important business was transacted without his approval.

Is it at all strange that his attorney asks in open court, "Who is John Alexander Dowie's equal in business capacity?"

If Dowie believes, as he says he does, in a theocracy, in other words, in a people governed by the immediate direction of the Almighty, like the Israelites of old, and his followers also believe the same, and that he speaks by the authority of God, can it be said that any one of his followers entering into a contract or business arrangement with John Alexander Dowie is not acting under "undue influence?" The law says that "undue influence" shall be presumed in such a case.

Dowie says upon the stand that he rules by love, but, "if they agree to follow my leadership, just as you might agree if you were a member of a voluntary regiment, and the captain says, you know, 'right about face,' then you would right about face, and if you don't, you are put out of the regiment."

He also said as to his methods of doing business with his departments and with his business cabinets: "I determine what ought to be done, *then* I consult them, as to whether they know a better way or not."

Mr. Stevenson said that so far as he knew no one ever suggested a better way than that suggested by John Alexander Dowie, except upon one occasion, and the only one,

when he, at a cabinet meeting, protested against substantially forcing Mr. Packard to become a member of the Church of Zion.

Also, it appears that this defendant has a wonderful power, not only with those with whom he is brought in individual contact, but a power to sway large audiences of his followers at will. When, in the month of June last, in the presence of several thousand people, after a long discourse in which he quoted verse after verse from the Bible to show that the spirit of Elijah was incarnate in himself, and that he was Elijah the Second, and demanded of the audience whether they believed him to be Elijah the prophet, nearly the entire audience arose to their feet and proclaimed their belief in him,—that he was Elijah. The few who did not rise, being so small a number as to be indistinguishable. On more than one occasion he demanded of those in the audience who had been divinely healed, to rise to their feet and more than two thousand persons arose to their feet and testified that they had been healed by divine power. "Did I heal you?" demanded Dowie. "No." "Did God heal you?" "Yes." If they had been asked "Were you healed by Dowie's laying on his hands and praying God to heal you?" the answer would undoubtedly have been in the affirmative.

As the general overseer and the head of the Church of Zion, he collects one-tenth, like the Jewish tithes of old, and not only that, but he insists on liberal donations being made toward the church.

On one occasion he talked to his audience in the following style, which is given as a specimen of the manner in which he talked to his audiences as to contributions.

" 'Shall we put our all in?' said Ananias and Sapphira.

" 'I say, Ananias,' said Sapphira, 'we sold that for ten thousand dollars. We will give them five, but let's tell them it is all we have.'

" 'All right, Ananias.' 'Sapphira, you stay at home.'

" 'Peter, Apostle of the Lord, I come.'

" 'Who are you?'

" 'I am Ananias.'

" 'And with what do you come?'

" 'Five thousand dollars.'

' 'What did you sell your land for?'

" 'Five thousand dollars. Here it all is, blessed Apostle.'

" 'You liar! Ananias, thou hast lied to God and not to man. You have lied against the Holy Ghost. Die!'

"He died. They wrapped him up, and took him out.

" 'O, Holy Apostle!'

" 'Who are you?'

" 'I am Sapphira.'

" 'Well, what have you to say?'

" 'Ananias came with all our possessions.'

" 'Well, it was your own, could you not do what you liked with it?'

" 'Yes, we have devoted it all to God.'

" 'You liar! You liar! The keeping back of that five thousand dollars is your death. Die!' She died.

"I wonder how many Ananiases and Sapphiras there are in Zion? (Laughter.)

"All I have to say is this: If I were you, Ananias, I would tramp back to the Methodists. You will be lonely in Zion.

"Sapphira, I would go to the Baptists.

"Why? Because you will die in Zion most surely.

"I will find you out some day, and if ever I do, that will be the last of you, so far as your connection with Zion is concerned, you pair of hypocritical pretenders.

"What do I mean?

"I mean this:

"I will ask God to take you out, you liar.

"I do not want men in Zion to say, 'All I have, and all I hope for,' and then come with an Ananias and Sapphira consecration.

"You will notice that the fourth chapter which I read leads up to the fifth, and I am going to preach on Ananias and Sapphira next Sunday.

"If Ananias and Sapphira come here, they will have a hot

time, and if they stay away, we will know why they stay away, and they will get into a hotter time. (Laughter.)

"I am going to have things restored to Apostolic conditions.

"Is that right?

"Audience—'Yes.'

"General Overseer—Everybody who says, 'All I have, I consecrate to God,' stand right up. (Nearly all arose.)

"Ah, some of you are keeping back part of the price, are you?

"Some of you are sneaking out. You cannot get away from God, though. He will look after you.

"We are right up against some plain and practical questions.

"I ask you the question as you stand here, Do your spirit, your soul, and your body, belong to God?

"Audience—'Yes.'

"General Overseer—Your time, your money, and your talents?

"Audience—'Yes.'

"General Overseer—Your property?

"Audience—'Yes.'

"General Overseer—Your all?

"Audience—'Yes.'

"General Overseer—Are you willing to put all into Zion?

"Audience—'Yes.'

"General Overseer—Then do it quick.

"Oh, but you know, the apostles might not have been good business men.

"Did not Christ make them apostles?

"Audience—'Yes.'

"General Overseer—Did he not give them wisdom?

"Audience—'Yes.'

"General Overseer—Do you not think that they were pretty good business men?

"Audience—'Yes.'

"General Overseer—Did God put me here?

"Audience—'Yes.'

"General Overseer—Well, then, can you trust me?

"Audience—'Yes.'

"General Overseer—Come along then; roll up your dollars tomorrow, and the next day, and the next day, and the next day. Get in quick.

"Everything must be put into the Ark of Safety in Zion."

The manner in which Dowie raises money in furtherance of the Zion Lace Industries and the confidence and trust inspired by him through his publications in the Leaves of Healing in exploiting the Zion Lace Industries, are shown by the rapidity with which said shares of preferred stock were sold when put upon the market, none of them, as is stated, being sold to others than the members of the Church of Zion.

The court has heretofore referred to the fact that on July 28th, 1900, the defendant in an editorial article in the Leaves of Healing, exploiting the Zion Lace Industries, called attention to Cashier Barnard's announcement in regard to the sale of the preferred stock appearing in the same issue of the paper, which was as follows:

## WE OFFER FOR SALE

### $400,000

ZION LACE INDUSTRIES STOCK.

---

### Shares $100 Each.

---

Interest payable semi-annually, at the following rates:

First year............................ 6 per cent.
Second year.......................... 7 per cent.
Third year............................ 8 per cent.
Fourth year.......................... 9 per cent.
Fifth year............................10 per cent.
Sixth year............................11 per cent.
Seventh year.........................12 per cent.

## STATEMENT.

Estimated area occupied by industries.......50 to 60 acres

Estimated number of hands employed at the
    end of five years........................        50,000

Estimated value of property at the end of five
    years, at least...........................     $5,000,000

---

The evidence tends to show that with the exception of the erection of a shed, no buildings of a permanent nature had been erected upon the site of the proposed industries at that time, and little done beside the importation of a portion of the machinery, yet it appears that in response to this offer of sale, which was an appeal not only to the credulity but also to the avarice of the investors, there had been realized at the time of the hearing of this cause the sum of $431,200 actual cash, and it was a disputed question as to whether or not said Zion Lace Industries were then in effective operation, it being admitted that none of the buildings necessary therefor was in a finished condition, and that very much more remained to be done.

Dowie's church, which was organized in the city of Chicago but a little more than five years ago, it was testified, has increased until the number of his adherents is fifty or sixty thousand persons.

Its doctrine, or its creed, if any it has, does not appear by the evidence. It does appear that Dowie teaches that all men must repent, and having repented, they must restore that which they have stolen, or out of which they have defrauded others, and surrender themselves to God, and it must be said of John Alexander Dowie that so far as shown by the evidence in this case, *ex facie* his teachings are not immoral and make for the general good. He teaches and enforces strict temperance among his people; he allows no saloons in the city of Zion; no billiard rooms; no gambling houses; no immorality or vice of any kind, and even the use of tobacco is prohibited among his followers.

It may be that these teachings account to a large extent for the influence which he wields over his followers; they undoubtedly tend to intensify his power and influence over them, but there is a strong inconsistency in the character of this man, which it is difficult to account for.

His manner of speech in the pulpit, as well as in common conversation, is at times violent in the extreme; it appears by the evidence that the complainant's wife was taken sick in England, just before their return to America, and though the prayers of Dowie and her husband were exercised in her behalf, they were without avail; that although afflicted with pleurisy, she was taken on board of the ship, as complainant says, because of her own insistence, she wishing to accompany him on his return to America.

Three days out she died—and it is a fair inference—a victim to her belief in the efficacy of prayer to cure disease.

In an interview between Stevenson and Dowie, which took place about the 18th of May, and which had been brought about in the negotiations for a settlement, Dowie, referring to the sickness of Methie, became enraged to the extent that reciting the circumstances connected with her sickness, he ended by saying to Stevenson, "Before God, I look upon you as her murderer." In the issue of November 9th, 1901, he published in his own paper an article stating that he had removed Stevenson from the office of deacon and from fellowship of the church. He refers to that date as being the anniversary of the death and burial at sea of his sister Mary, and in another publication, a few days thereafter, headed "An Apostate Liar Rebuked," he says that Stevenson "has not hesitated to cast what seems to us a shameful reflection upon his dead wife's memory," probably referring to the charges made in the bill, or purporting to have been made through the statements in the newspapers, and says, "It is a most shameful thing that he should do this upon the anniversary of her death, when he cast her body into the sea, apparently afraid to permit it to come to shore. It could then have been examined, and the real cause of death ascertained."

Upon one occasion, when he made the charge of Stevenson being his wife's murderer, it was in the presence of the two brothers of Stevenson, who expostulated with him after Samuel Stevenson had left, and he retracted to the extent of saying that he meant that he was criminally negligent in caring for his wife in her last sickness.

He often, according to the evidence, made use of expressions which would appear to the world to be unbecoming in a minister of the gospel. His manner is often passionate and violent, even in the pulpit, and there is some evidence tending to prove that in addition to his claiming to have a divine mission, and to speak and command by the authority of God and demand obedience to such commands, that he mingled therewith covert threats as against those who opposed him as overseer of the church, or the work in which he is engaged, which were calculated to inspire terror in those who heard him.

It is evident that he belongs to the church militant, and that he does not observe the injunction given by Him whom he claims to follow—"Whosoever smiteth thee on the right cheek turn to him the other also;" but, on the contrary, to use a common expression he strikes right out from the shoulder.

Stevenson testified that he once believed that Dowie could call down a curse upon him if he disobeyed him, and that he had heard the Miss Daubneys and other members of the church say they were afraid of him; that he heard him say, with regard to the Chicago press, if they went on in their wicked ways, he would pray to God, and that God answered his prayers. Then he recites how some of them died, "this man died, that man died, and this was going to die. He does a great deal by way of suggestion; he does not say it absolutely but you have to take the inference."

Stevenson refers to the case of Dwight L. Moody, that Dowie said unless Dwight L. Moody ceased to fight Zion, he would not say he would live, and that he, Dowie, afterwards referred to the death of Moody. "He took sick on that account, and was never well afterwards, or words to that

effect." This statement, he says, was made in the taber-
nacle to an audience, and is to be found in the Leaves of
Healing.

Stevenson also testified that he commands his people to
obey him, because he receives his orders from God, that he
is indwelt with God's spirit; that he is acting as God's mes-
senger. He commands all the people to obey him as he
obeys God, and then he says, "Because God has given him
this authority and confirmation of his work by the sign,
they are to help him and bring in their tithes and offerings
and help to support Zion; and unless they do, they will be
cursed with a curse." And that these statements "can be
found in the Leaves of Healing and the Zion periodicals."

Aside from the question of undue influence of Dowie with
his powerful will, dominating and controlling the mind of
the complainant, a deacon and a member of his church,
thereby inducing him to enter into the agreement of August
4th, whereby as we have seen, the complainant was entitled
to have such agreements declared of no force or effect,—the
further question is presented in this case, whether or not the
so-called public agreement of August 4th, for the carrying
on of the Zion Lace Industries, is not absolutely void as be-
ing opposed to public policy, or, as sometimes called by the
English courts, "public utility."

The first case in which it appears that an instrument has
been set aside upon the principle of public policy was the
case of *Norton v. Reily,* reported in 2 Eden, 286, in which
"a grant of annuity obtained by a dissenting minister hav-
ing spiritual ascendency over a woman under a state of re-
ligious delusion," was set aside, upon principles of public
policy.

The next case in which the principle was applied appears
to have been the case of *Huguenin v. Baseley,* reported in
17 Vesey, 273; the relief sought was to have the voluntary
settlement by a widow upon the defendant, a clergyman, and
his family, set aside, as obtained by undue influence, and
abused confidence in the defendant, as an agent undertak-
ing the management of her affairs;—the deeds were set aside

upon the principles of public policy and utility, applicable to the relation of guardian and ward.

Although in that case there was a gift by a deed of trust, such deed was held in the nature of a contract by which there was to be paid her an annuity for life of four hundred pounds per annum out of the property, which produced more than that amount, "with remainders to trustees to preserve contingent remainders to his wife for life, to their children, born or to be born, in tail, with cross remainders, and the ultimate remainder to Mrs. Huguenin."

It will be seen by the authorities quoted in that case and the note thereto, that the principles laid down in that case were clearly applicable to contracts as well as gifts. The contract and the interest in the corporation formed in pursuance thereof, which the complainant was induced to surrender to the defendant Dowie in this case, was practically a gift. As we have seen, there was really no consideration for his exchange of his rights and position under the contract of April 12th, for the rights and position which he obtained under the public and private agreements of August 4th.

In the case referred to, the court held that the conveyance was executed under the effect of that which has always been considered in this court as undue influence. And, as to whether the court should undo the instruments in question in that case, the Lord Chancellor Eldon says: "I answer no, if they are pure, voluntary, well understood acts of her mind; but if they have not that character, if they are the result of her notion that this is the true effect of that friendly assistance, that kind, providential interference which she was looking for in the management of her affairs, with advantage and facility to herself; if the conveyance was executed under the effect of that, which has always been considered in this court as undue influence, if the deeds themselves, which are the best evidence, demonstrate, and if they are confirmed by extrinsic evidence, that they are not the pure, well understood acts of her mind, this court will undo them."

Lord Eldon, after reviewing certain circumstances, pro-

ceeds: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced; whether all that care and providence was placed around her as against those who advised her, which, from their situation and relation with respect to her, they were bound to exercise on her behalf. * * * In that view of the case, no evidence out of these instruments could satisfy me that Mrs. Huguenin understood them. I believe, further, that the parties to the transaction did not understand it. Repeating, therefore, distinctly, that this court is not to undo voluntary deeds, I represent the question thus— whether she executed these instruments not only voluntarily, but with that knowledge of all their effect, nature and consequences, which the defendants, Baseley and the attorney, were bound by their duty to communicate to her, before she was suffered to execute them and though, perhaps, they were not aware of the duties which this court required from them, in the situation in which they stood, where the decision rests upon the ground of public utility, for the purpose of maintaining the principle, it is necessary to impute knowledge which the party may not actually have had."

These remarks quoted could be used by this court word for word, as applicable in the case at bar, simply by substituting the complainant's name for Mrs. Huguenin and the name of Dowie for Baseley, the defendant in that case. (See *Huguenin v. Baseley*, 2 White and Tudor's Leading Cases in Equity, 597 and note.)

The knowledge which was to be imputed to these parties referred to by Lord Eldon was the knowledge of the legal effect of the instruments, which the woman in that case was induced to sign.

He holds that the defendant and his attorney—whether they did in fact or not—must be held presumed to know all the consequences of the instrument which the woman was induced to execute, and failed to advise her thereof.

It is very evident from Mr. Packard's argument addressed in favor of the advantages of the "association" plan over that of an incorporation, referred to, that he could not have

advised Stevenson of his rights and the legal effect of the transaction of August 4th, 1900. He honestly believed the association plan was better for all parties.

The relations between the clergyman and the woman in that case were held similar upon principle to the relations upon which the courts had repeatedly acted, setting aside transactions between guardian and ward, occurring shortly after the relation ceased to exist. That as contracts and gifts between guardian and ward—made after the relation ceased, but the influence thereof still continued—were not allowed to stand, upon the principle that the public good demanded that such transaction should not stand, so the public good or public policy, demanded that transactions between a clergyman and his parishioner, where the influence of his relation prevailed, were alike to be held void upon the principle that the interest of the general public demanded such holding.

The closing reply of Sir Samuel Romilly in that case, in arguing that the principle that had always been applicable in the case of guardian and ward and husband and wife, should be applied in the case of *Huguenin v. Baseley*, has often been quoted.

He says: "Why does not the principle apply with infinitely greater force to the present case? What is the authority of a guardian or even parental authority? What are the means of influence, by severity or indulgence, in such a relation, compared with the power of religious impressions under the ascendancy of a spiritual adviser; with such an engine to work upon the passions, to excite superstitious fears; or pious hopes; to inspire, as the object may be best promoted, despair or confidence; to alarm the conscience by the horrors of eternal misery, or support the drooping spirits by unfolding the prospect of eternal happiness; that good or evil which is never to end? What are all other means to these? Are inferior considerations to have so much effect; and is no regard to be given to the most powerful motive that can actuate the human mind? Though no direct authority is produced, your Lordship, dispensing justice by the same

rule as your predecessors upon such a subject, not confined within the narrow limits of precedent, will, as a new relation appears, look into the principles that govern the human heart, and decide in a case far the strongest that has occurred, upon this ground alone, from its infinite importance to the community.''

And in this case, the question is: Whether it is not of infinite importance in this community, to the public at large, to the public good, not only that this transaction should not stand as between Dowie and Stevenson, upon the ground of Dowie's undue influence over Stevenson, but that it should be held absolutely void as opposed to public policy.

By this public agreement of August 4th, under which these Zion Lace Industries were to be conducted, a corporation was incorporated under that name, elected its officers, received its certificate of incorporation in the county where the industries were situated, thereby holding out to the public (except to those who might be specially informed to the contrary) that the industries were being carried on under such public incorporation, when in truth and in fact, they were being carried on under an association agreement, having no resemblance to an organized state institution. The public would naturally suppose that the ''Zion City Bank,'' the ''Zion Land & Investment Association,'' the ''Zion Lace Industries,'' and others of the thirty-eight associations, of which Dowie was the head, and as to some of which he signs himself as president, were regularly incorporated institutions. The ignorant and unwary most assuredly might be led into trading with them and dealing with these associations under the belief that they are incorporated and under state license and supervision.

But it is only necessary in this case to decide as to the ''Zion Lace Industries,'' which differs from the other thirty-seven departments or associations, in that there is a legally organized existing incorporation of the same name, and as to that association it must be held that the public interests demand that this public agreement of date August 4th, 1900, under which said ''Zion Lace Industries'' are now being

carried on, be held opposed to public policy, and for that reason void as between the parties to this suit.

What may be the effect of its being held void upon the ground of public policy, upon the preferred shareholders and creditors dealing therewith is not necessary now to determine, as they are not at present parties to this suit.

As to the contention of the defendant that the complainant is entitled to no relief because of his delay in commencing this suit, which delay it is contended was from about the 1st of April, 1901, until the 16th of November, 1901, it is true that a party who seeks to avoid a contract upon the ground of undue influence must be prompt in seeking a remedy.

Equity requires vigilance in all parties demanding relief from actual fraud or constructive fraud, but the circumstances detailed in the evidence of the attempt of the complainant, and by a just inference of the defendant also, to settle the controversy or settle the differences between them, which extended practically during the whole of the time of said delay, takes this case out of the rule governing laches in the assertion of complainant's equitable rights.

The law looks with favor upon efforts to settle controversies, even going so far as to prohibit evidence as to what was said or done in pursuance of such efforts, and it would be strange if a party was trying to settle with his adversary, or two parties were trying to settle a controversy as in this case, that the one who might be adjudicated to have had the right of the controversy, should be defeated in such rights by reason of such commendable delay.  Neither am I satisfied from the evidence that the complainant was then fully advised of his rights in the premises, or entirely free of the dominating influence and fear of defendant.

As to the other contention of the defendant that the complainant ratified the public agreement of August 4th by accepting interest or dividends paid upon his $100,000 of stock in the association, the complainant never had delivered to him the $100,000 of stock.  It was not issued to him until, it is claimed, that he accepted the dividends upon the same. What is claimed to have been accepted as dividends upon

this stock arises out of the fact that the complainant, having been allowed to overdraw his account in the Bank of Zion, the defendant caused a credit to be entered upon the books of the bank in favor of the complainant, whereby his account was credited with two items, one being the so-called dividend on $100,000 of stock, and the other being a certain amount which the defendant arbitrarily fixed as compensation for complainant's services as manager of said Industries, whereby this overdraft was wiped out, or substantially so; in other words, it is claimed that the defendant ratified the transaction by an act which was entirely the act of the defendant himself, with the suspicion attending it that it was done for the purpose of entrapping the complainant into such ratification. A ratification can only arise from the act of the mind, the intent of the party to ratify, knowing all of the facts and circumstances connected with the transaction. An intent to ratify a transaction cannot be held to arise by reason of a' credit made to a deficient bank account under the circumstances stated. At the same time that notice that this credit had been passed to his bank account was sent to him, there was sent this $100,000 of stock which he promptly returned to the secretary sending the same, refusing to accept of it. It is impossible to say that he intended to ratify the transaction, though refusing the stock, by simply not protesting against the credits in the bank account, when it is very doubtful whether he understood what they meant.

If the articles of agreement under which the Zion Lace Industries are carried on are to be held void, as against public policy, as I have held they should be, it is at least doubtful whether the complainant could, by any direct or indirect act of his own, by way of ratification or otherwise, make them legal and valid.

As to the defendant's contention that Stevenson had independent advice before entering into the public agreement, and is therefore not entitled to relief:

That a party took independent advice is not of itself a ban, but is only a circumstance (and may be one of great weight) to be taken into consideration. If it is competent

legal advice, it is of almost controlling weight, but if it is not legal advice, it is of little consequence. Stevenson took the advice of Deacons Barnard and Judd. They were witnesses in this case, and their evidence shows that Stevenson might just as well have taken more advice from John Alexander Dowie himself.

As to the $50,000 of stock, a certificate for which was issued in the name of the wife of complainant, and received by complainant as executor and legatee under her will, and by him probated and inventoried as assets of her estate, no relief can be granted the complainant as an individual in this case, for the reason that it clearly appears that the complainant, on the night of August 8th took up an ante-nuptial note of $50,000 and received therefor the sum of $50,000 in checks of John Alexander Dowie upon the Zion City Bank, and gave that $50,000 to his wife as he had promised by that note; it being practically all that the complainant had in the world except the $100,000 of stock.

It may have been an act of folly on his part, but he does not, nor can he, under the evidence repudiate his ante-nuptial gift to his wife.

The bill does not charge, nor does the evidence show, that when she passed the checks over to the defendant Dowie, with the request that the money be invested in stock of this new association, she was acting under any undue influence of John Alexander Dowie, or that she ever repudiated the transaction.

The complainant cannot in his own right repudiate the transaction as to *her* by reason of any undue influence which the defendant Dowie may have exercised over *him*.

He can sue, as her executor, as to the transaction connected with the certificate for $50,000 of stock.

He does not in this case sue as executor, and no rule is better established than that a party cannot have relief as an individual complainant, where his rights are those which appertain to him in his representative character as executor of a deceased person.

The complainant will have leave to become co-complainant

as executor, and the bill may be amended by making such allegations as executor as he may by his counsel consider to be necessary or proper.

In arriving at the conclusion that the transaction evidenced by the two agreements of date August 4th, 1900, must be set aside, and said agreements held of no binding force the court is not interfering with the constitutional right of parties to make contracts, but is only preserving that right in its purity, in applying to the case at bar the equitable principle that the transaction must be set aside and Dowie deprived of the benefit thereof, because the complainant did not act voluntarily, knowingly, intentionally and deliberately with full knowledge of the nature and effect of his acts, and because the consent to the transaction was obtained by the undue influence which Dowie exercised and was able to exercise by reason of the relations existing between Stevenson and himself.

Nor is any question of religion involved in this controversy. Dowie has the constitutional right to teach any religious doctrine that he thinks proper.

The only matter involved is the validity of a business transaction.

There is, however, a curious intermingling of religion and business in the transaction complained of.

"Religion" and "business" do not mix well together. The one is the service of God; the other is generally considered the service of Mammon. The history of all business enterprises, banks, manufactories, etc., which commingle business and religion, shows that they have ultimately resulted in disaster.

It is not necessary for the court to determine whether the defendant is carrying on the various enterprises, for his own financial benefit. There is some evidence to that effect, (and that he is not losing any money in so doing) but it falls short of being sufficient proof that he is merely seeking his own advantage.

Upon the contrary, the evidence strongly tends to prove that the defendant is a religious enthusiast, a religious zealot,

who honestly believes that he has a divine mission to convert sinners and build up "Cities of Zion" in every land, "to be inhabited by God's people who are to be governed by the immediate direction of the Almighty, speaking through His Prophets and others divinely authorized;" also, that he is carrying on these various industries, as he believes, for the glory of God and to effect such purposes.

If he is merely such a religious enthusiast, it makes his power over the members of his church so much the stronger than that of the ordinary clergyman, and the undue influence which the law presumes to exist from such relation, only so much the greater.

Having held the transaction of August 8th, 1900, not binding upon the complainant, and that the so-called public and private agreements of August 4th, 1900, must be set aside and held for naught for the reasons hereinbefore stated, what relief is the complainant entitled to upon the case as made by the pleadings and the proofs.

The prayer of the amended bill is, in substance, that the two contracts between Dowie and Stevenson of date August 4th, 1900, be declared null and void, and be delivered up and cancelled; that contract of date April 12th, 1900, be decreed to be still in force and to remain in full force and effect, and that defendant be required to perform the same to issue the stock of the corporation formed under said agreement; to transfer to complainant 1,000 shares of the par value of $100 each; that defendant be required to pay complainant the said $50,000, turned over by complainant to Mary Ann Stevenson, and such further sum, as on an accounting may be found due to complainant; also, that complainant may have such other and further or different relief as the court could grant if specially prayed for.

The court has held that the complainant is not entitled to any relief in his own right, as to the said $50,000 turned over by complainant to his wife on the 8th of August, 1900.

That as between complainant and defendant the two contracts, dated August 4th, 1900, ought to be set aside and declared of no binding force or effect.

That as between Dowie and Stevenson, the contract dated April 12th, 1900, was valid, and remains in full force and effect; that the "Zion Lace Industries" incorporated in pursuance of the agreement of April 12th, was a fully organized corporation, with one million dollars of capital stock—all subscribed for—and capable of holding property and performing all the functions devolved upon it by law.

Also, that complainant is entitled to receive from Dowie a certificate of fully paid stock of said corporation to the amount of $100,000.

The court has also found that said Dowie has not fully carried out said agreement of April 12th, 1900, but has failed so to do, and in equity should be required so to do, but the court finds itself unable to proceed to a full and final decree herein at this time for the want of necessary parties.

In the first place the legal corporation, the "Zion Lace Industries" is a necessary party to this litigation.

It is a legal entity, and acts by its officers in pursuance of the statute. It is true Dowie subscribed for all but four shares of the one million dollars of stock, but that was Dowie the individual, and he did not become thereby the corporation itself. He cannot act otherwise than as its president and a stockholder.

The duly elected board of directors can only order the issue of stock, and the court cannot order the board or the corporation to issue stock or do any other act, or make any decree in favor of the corporation as such, except the corporation and its board of directors are in court. They are not before the court, nor can the defendant Dowie be said to be here representing them.

The other four subscribers for one share of stock each, are necessary parties to any litigation like the present where, among other questions, the court would have decided whether or not there had been an abandonment of the corporation.

The Zion Lace Industries corporation, at the time the agreements of August 4th, 1900, were entered into, was and still is the equitable owner of all the property known as the

"Zion Lace Industries." Since Dowie took possession of the same and carried them on under the agreements of August 4th, 1900, large additions and values have been added thereto.

The question arises in this case: Shall these additions and values be held to be the property of the corporation, and if so, upon what terms? Not only is the corporation, its board of directors and all its stockholders, interested therein, and therefore necessary parties, but all the subscribers to and the holders of the common and of the preferred stock of the so-called association carried on by Dowie should be made parties.

It appeared on the hearing that preferred stock to the amount of $431,200 had been sold under the August 4th agreement, and some common stock issued thereunder. Although it may be reasonably contended that Dowie under that agreement, must be held to represent the common and preferred shareholders, and that some of them took *pendente lite,* yet the court is not informed when they became severally such shareholders. As to those who became such between the time Stevenson repudiated the agreements of August 4th, 1900, and the commencement of this suit, there may be equities arising out of Stevenson's delay in making the matter *lis pendens* by commencing this litigation.

If there are any liens upon the Zion Lace Industries, arising since the 8th of August, when Dowie may be said to have taken possession under said so-called association agreement, or any persons have become since that date creditors in connection with said Zion Lace Industries, their rights and equities may have to be adjudicated.

The court does not hold that such creditors and lienors, if any there be, are necessary parties, but they have an interest which may entitle them to intervene.

It is not only the right of the court, but its duty, to require that all persons not parties to the suit, who appear to have any interest in the subject matter in litigation, be brought into court by the proper process, before making a

final decree in such suit, in order that there may be an end of litigation by adjudicating upon the rights of all parties interested in the subject matter.

It is also a maximum of equity that no persons shall be injured in its court by mispleading or want of form.

It appears to the court that when these necessary parties come in and issues are made up upon their answers, and evidence, if necessary, heard thereon, there may be found such complications as to the respective equities of the parties to the litigation and such difficulties in adjusting such equities that, in order to prevent undue loss to some of them, it may be necessary for the court to assess complainant's loss and damages (in lieu of all other relief) upon a basis that may be then warranted, but which basis the court cannot now determine.

The defendant will be ordered to, within twenty days, furnish complainant a list of all subscribers to (and so far as he knows, of all present holders of), the said common stock and of said preferred stock, issued under said public agreement of August 4th, 1900, showing the date when they became such subscribers, and so far as he can, such holders; and the amount so subscribed for and now held by such person or persons, respectively.

In view of the fact that the defendant is in possession of all the property and assets of said Zion Lace Industries, claiming the same under the said agreement of August 4th, 1900, which the court has decided should be set aside and held as nought, so far as complainant's rights are concerned, and as complainant is entitled upon the proofs before the court to have a receiver appointed to conserve said property and assets of said Lace Industries now in the possession of said defendant Dowie, and claimed by him under and by virtue of said agreement of August 4th, 1900:

THE COURT ORDERS, That Elmer Washburne be appointed receiver of all the property and assets known as the "Zion Lace Industries," now in possession of said defendant, John Alexander Dowie, and claimed to be held and owned by him under said public agreement of August 4th, 1900, with the

usual powers of receivers; to hold the same for the benefit of all parties interested therein, and subject to the order of this court. Said receiver to give bond with sureties, to be approved by the court, conditioned for the faithful performance of his duties, and the other usual conditions, in the penal sum of —————— dollars.

A decree in accordance with the views expressed herein will be prepared, but there must be an express reservation as to matters not adjudicated by such decree, and of the right of the court to make such other findings and decrees herein as the court may hereafter deem proper.

The complainant may, if he desires, make such amendments to his bill, as he may deem necessary to conform to the findings of the court.